## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

NATIONAL ALLIANCE TO END
HOMELESSNESS
1025 Vermont Avenue, NW
Suite 1200
Washington, DC 20005, and

WOMEN'S DEVELOPMENT
CORPORATION
861 A Broad Street
Providence, RI 02907,

       *Plaintiffs*,

v.                                                          Case No.

SCOTT TURNER, in his official capacity as
Secretary of the United States Department of
Housing and Urban Development
451 7th Street, SW
Washington, DC 20410, and

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT,
451 7th Street, SW
Washington, DC 20410,

       *Defendants*.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.      Recognizing the pressing need to build more housing for homeless individuals

and families, Congress appropriated $75 million for the Department of Housing and Urban

Development to award to nonprofits, states, or localities to build permanent supportive housing.

As it was required to do, HUD identified qualified projects and was prepared to award these

essential funds, even going so far as to notify members of Congress of the selections. But, last week, days before the funds are set to expire, it abruptly reversed course and is now seeking new applicants based on newly announced criteria. Under these new criteria, HUD will only award those funds for projects in jurisdictions aligned with the Administration's broader social policy views and to applicants that will commit to them. And HUD is rushing the funds out the door, promising to award them during a 7-day period on a first-come, first-served basis for projects that clear its ideological threshold.

2.     The new notice of funding opportunity disqualifies from consideration any entity seeking to build housing in a jurisdiction with policies the Administration disfavors. This means there will be no funding for projects in a city or state that has not adopted the Administration's draconian approach to local homelessness policies and agreed to help enforce federal immigration law. And, even in jurisdictions with policies the Administration deems acceptable, entities effectively cannot compete for funding unless they profess agreement with the Administration's view that sex is binary and immutable and foreswear operating safe injection sites or similar programs designed to reduce the harm from drug use—even with wholly non-federal funds.

3.     HUD does not have authority to do this—and the Constitutional does not permit it. In our constitutional system, Congress controls the purse strings and decides what funding to provide, for what purposes, and under what criteria. And states and localities decide what policies to adopt and implement in their own local jurisdictions. HUD has transgressed both these bounds. HUD has likewise impermissibly trenched on states' and localities' powers by coercing them to abandon the policies their own citizens have chosen and to implement the executive branch's preferred policies instead. The new criteria conflict also with federal statutes

and regulations, violate constitutional rights, did not go through required procedures, and are arbitrary and capricious to boot.

4.      Both the process and substance of this new award process are shockingly unlawful and irreparably injure qualified applicants for these funds and the communities they serve, including Plaintiffs, the National Alliance to End Homelessness, on behalf of its members, and the Women's Development Corporation, a Rhode Island a nonprofit that develops and operates quality, affordable housing. Through this lawsuit, Plaintiffs request that the Court halt the current rushed, unlawful award process and preserve the funds at issue from expiration, allowing for their prompt award for projects that meet lawful criteria.

## PARTIES

5.      As set forth in its bylaws, Plaintiff National Alliance to End Homelessness (Alliance) is a nonprofit, nonpartisan membership organization that works to end homelessness in the United States and prevent its continued growth. The Alliance seeks to ensure that no American is homeless by mobilizing all sectors of American society in an alliance to end homelessness. The Alliance is located in Washington, D.C.

6.      The Alliance brings this lawsuit on behalf of its members, a robust coalition that works to end homelessness through collaborative action and proven solutions. Alliance members include nonprofit organizations, service providers, practitioners, local researchers, local and state government entities, and people with lived experience of homelessness—all of which are dedicated to ending homelessness and many of which receive HUD CoC grants. The September 5 Notice of Funding Opportunity (NOFO) injures many of the Alliance's members, such as Women's Development Corporation (WDC), by adopting unlawful criteria that render those members ineligible to compete for the CoC Builds funds. Many of these members, including

WDC, would apply for the CoC Builds grants under the September 5 NOFO if they were eligible, but are unable to do so because of the current criteria. Likewise, Alliance members who nevertheless move forward with the application are injured because their applications will be screened and evaluated according to unlawful criteria.

7.    The Alliance's members play a significant role in the organization by guiding the Alliance's agenda and activities through various means such as robust surveys and regular convenings; by contributing financial support through conference fees and donations; and by sitting on the Alliance's board and advisory bodies and helping to select the Alliance's leadership.

8.    Plaintiff Women's Development Corporation is a nonprofit headquartered in Rhode Island that develops and operates quality, affordable housing for low- and moderate-income families, people with special housing needs, and seniors living in Rhode Island and surrounding states. WDC has previously applied for HUD's CoC Builds grant, and would apply for that grant in the absence of the criteria at issue in this case, which render it ineligible. WDC is a member of the Alliance.

9.    Defendant Scott Turner is the Secretary of Housing and Urban Development. He is sued in his official capacity.

10.    Defendant United States Department of Housing and Urban Development is an executive department of the United States federal government headquartered in Washington, D.C. 42 U.S.C. § 3532(a). HUD is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

## JURISDICTION AND VENUE

11.    The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the claims arise under federal law, including the U.S. Constitution and the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*

12.    The Court has authority to enter a declaratory judgment and to provide temporary, preliminary, and permanent injunctive relief pursuant to Federal Rules of Civil Procedure 57 and 65, 28 U.S.C. §§ 2201–2202, the All Writs Act, and the Court's inherent equitable powers.

13.    Venue is proper in the District of Rhode Island under 28 U.S.C. § 1391(e)(1) because this action seeks relief against an agency of the United States and an officer of that agency acting in his official capacity and Plaintiff Women's Development Corp. resides in this district.

## BACKGROUND

**A.  The Administration leverages federal funding to advance unrelated policy goals and to punish jurisdictions with disfavored policies.**

14.    The Administration is leveraging federal funding to advance the President's ideological vision, including by blocking applicants from jurisdictions that do not comply with that vision. Upon taking office in January 2025, President Trump issued a series of executive orders that aim to effect sweeping social changes, including by directing agencies to terminate, withhold, or condition federal funding to coerce federal funding recipients to fall into line with various Administration policies, and to discriminate against those that offer opposing viewpoints.

### *1.  The Administration attacks sanctuary jurisdictions*

15.    Since taking office, the President has taken a series of actions designed to coerce states and localities into helping enforce federal immigration law.

16.     On his first day in office, for example, the President issued an executive order directing the Attorney General and Department of Homeland Security to "ensure that so-called 'sanctuary' jurisdictions"—jurisdictions that the Administration deems not to be sufficiently cooperative with federal immigration enforcement—"do not receive access to Federal funds." Protecting the American People Against Invasion, § 17, 90 Fed. Reg. 8443, 8446 (Jan. 29, 2025). This Executive Order also instructed those officials to take "any other lawful actions, criminal or civil, that they deem warranted" to address those jurisdictions' "interfere[nce] with" immigration enforcement. *Id.*

17.     A month later, the President issued another executive order, this time directing all executive agencies to ensure that "Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation." Ending Taxpayer Subsidization of Open Borders, § 2(a), 90 Fed. Reg. 10581 (Feb. 25, 2025). That order further directed White House offices to "recommend additional agency actions to align Federal spending" with the order's purpose of making public benefits unavailable to undocumented immigrants. *Id.* § 2(b).

18.     Later, the President issued yet another executive order further aiming to punish so-called "sanctuary" jurisdictions that decline to use their resources on federal immigration enforcement. This order instructs the Attorney General to publish a list of "sanctuary jurisdictions"—"States and local jurisdictions" that the Administration deems to "obstruct the enforcement of Federal immigration laws." Protecting American Communities from Criminal Aliens, § 2, 90 Fed. Reg. 18761 (May  2, 2025). It then instructs each federal agency to suspend or terminate federal funds, including grants and contracts, to those jurisdictions. *Id.* § 3(a).

19.    DOJ published the ordered list of sanctuary jurisdictions on August 5, 2025. Press Release, Off. of Pub. Affs., Justice Dep't Publishes List of Sanctuary Jurisdictions (Aug. 5, 2025), https://perma.cc/XQV6-D562. Rhode Island is included on that list.

### 2. The Administration attacks unhoused people's rights

20.    The Administration has also launched an attack on a resource that our most vulnerable citizens need: a rapid connection to permanent housing.

21.    On July 24, 2025, the President issued Exec. Order No. 14321, titled "Ending Crime and Disorder on America's Streets." 90 Fed. Reg. 35817 (Jul. 29, 2025) ("Unhoused People" Order). That Order portrays homelessness as a criminal issue rather than a societal challenge requiring systemic solutions. Without citing any supporting sources or data sets, the Order declares that "the overwhelming majority" of "individuals living on the streets in the United States" "are addicted to drugs, have a mental health condition, or both." The Order also declares that the "Federal Government and the States have spent tens of billions of dollars on failed programs that address homelessness … leaving other citizens vulnerable to public safety threats." The Order conflates unhoused people with perpetrators of crime despite data supporting that individuals experiencing persistent homelessness are the ones actually at higher risk of violent victimization.[1]

22.    Taking only a punitive approach to unhoused people which calls for "ending" all "'housing first' policies," *id*. § 5, the Unhoused People Order urges increasing federal funding to municipalities that enforce laws prohibiting "urban camping," "loitering," and "urban squatting"

---

[1] Michelle S. Tong, et al., *Persistent Homelessness and Violent Victimization Among Older Adults in the HOPE HOME Study,* J Interpers Violence 1, 1 (Sept. 2021), https://perma.cc/REZ8-VDRD (finding that "[o]lder homeless adults experience high rates of victimization," and "[r]e-entering housing reduces this risk").

under the guise of "fighting vagrancy," *id*. § 3, going as far as inviting states to request federal

law enforcement assistance from the Attorney General through 34 U.S.C. § 50101 for

"encampment removal efforts" that displace people who are unhoused, *id*.

23.    The Unhoused People Order disparages "housing first" policies as "fail[ing] to

promote treatment, recovery, and self-sufficiency." *Id*. § 5. Additionally, the Order encourages

the involuntary institutionalization of unhoused people by asking state and local governments to

civilly commit people who are unhoused and force them into treatment. *See Id.* § 2.

24.    The Order also directs federal agencies to divert funds away from programs that

promote non-punitive approaches toward "harm reduction" or "safe consumption" efforts so

agencies can "prioritize available funding to support the expansion of drug courts and mental

health courts." *Id*. § 4(b).

### 3.    *The Administration attacks transgender rights*

25.    The Administration has also launched a broadside attack on the rights and dignity

of transgender people.

26.    On January 20, the President issued Exec. Order No. 14168, titled "Defending

Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal

Government." 90 Fed. Reg. 8615 (Jan. 30, 2025) ("Gender Ideology" Order). That Order

announces that "the policy of the United States" is "to recognize two sexes, male and female,"

that are "not changeable and are grounded in fundamental and incontrovertible reality." *Id.* § 2. It

decries "the erasure of sex" in both "policy" and "language," and it commits to using what the

Administration considers "accurate language and policies that recognize women are biologically

female, and men are biologically male." *Id.* § 1.

27.     To accomplish its ideological vision, the "Gender Ideology" Order makes a host of directives, including requiring federal agency heads to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology" and to "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." *Id.* § 3(e), (g). The Order defines "gender ideology" as an ideology that "replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity" and "includes the idea that there is a vast spectrum of genders that are disconnected from one's sex." *Id.* § 2(f). The Order disparages this viewpoint as "false" and "internally inconsistent." *Id.*

## B. The HUD Continuum of Care program funds assistance for individuals and families experiencing homelessness

28.     Congress enacted the McKinney-Vento Homeless Assistance Act (Homeless Assistance Act) in 1987 to establish a coordinated federal response to homelessness, including by providing funds for programs to assist homeless individuals and families. Pub. L. No. 100-77, § 102 (1987), *codified at* 42 U.S.C. § 11301.

29.     In 2009, Congress passed the Homeless Emergency Assistance and Rapid Transition to Housing (HEARTH) Act, which amended the Homeless Assistance Act to establish the Continuum of Care (CoC) program, which is designed to help individuals and families experiencing homelessness move into transitional and permanent housing, with the goal of long-term stability. Pub. L. No. 111-22, § 1301(2) (2009), *codified at* 42 U.S.C. § 11381. Congress created the CoC program "to promote community-wide commitment to the goal of ending homelessness," to support efforts by nonprofit providers and state and local governments "to quickly rehouse homeless individuals and families," to "promote access to, and effective utilization of, mainstream programs," and to "optimize self-sufficiency among individuals and

families experiencing homelessness." 42 U.S.C. § 11381. The CoC program codifies a rehousing approach coupled with ongoing supportive services. *See* 42 U.S.C. § 11383.

30.     The CoC Program funds a variety of programs that help homeless individuals and families, including by constructing new housing units for permanent or transitional housing, rehabilitating structures to provide such housing, providing rental assistance, and offering supportive services such as child care, job training, healthcare, mental health services, trauma counseling, and life skills training. *Id.* §§ 11383(a), 11360(29).

31.     CoCs, the community-wide bodies responsible for coordinating homelessness response systems, provide essential services to millions of individuals and families experiencing homelessness.

32.     In 2022, in addition to amounts appropriated for the CoC program generally, Congress appropriated $75 million for "one-time awards under the Continuum of Care program for new construction, acquisition, or rehabilitation of new permanent supportive housing." Pub. L. No. 117-328, 136 Stat. 4459, 5160 (2022). The appropriations act specifies that "these amounts shall be awarded on a competitive basis, based on need and other factors to be determined by the Secretary, including incentives to establish projects that coordinate with housing providers, healthcare organizations and social service providers." *Id.* Those funds remain available until September 30, 2025. *Id.* at 5158.

**C.  Statutes and regulations govern HUD's administration of the CoC grant program**

33.     Congress established statutory directives governing how HUD may administer the CoC Program and award CoC Grants, including delineating which activities are eligible for funding, selection criteria that HUD must apply to awards, and the program requirements that grantees must agree to as a condition of receiving funds. 42 U.S.C. §§ 11383; 11386a; 11386.

34.     For instance, the Homeless Assistance Act requires the HUD Secretary to establish certain "required" selection criteria that the Secretary must use to evaluate grant applications. *See id.* § 11386a (listing required criteria such as reducing length of homelessness, rehousing effectiveness, collaboration with schools, and success in serving high-risk subpopulations).

35.     The Act also specifies the "[r]equired agreements" to which grant recipients must agree to receive funds under the program. *Id.* § 11386(b). For instance, recipients must agree to operate funded projects in accordance with statutory requirements, to involve individuals experiencing homelessness in project operations where practicable, and to certify that children in family programs are enrolled in school and connected to services such as Head Start and Individuals with Disabilities Education Act programs. *Id.*

36.     The Homeless Assistance Act also authorizes the HUD Secretary to promulgate regulations establishing other terms and conditions on grant funding and other selection criteria "to carry out [the CoC program] in an effective and efficient manner." *Id.* §§ 11386(b)(8); 11386a(b)(1)(G); 11387.

37.      Pursuant to this authority, HUD promulgated a Rule implementing the Continuum of Care Program (CoC Rule). This Rule addresses "how to establish and operate a Continuum of Care, how to apply for funds under the program, and how to use the funds for projects approved by HUD," 77 Fed. Reg. 45422 (Jul. 31, 2012), and sets forth application requirements and additional conditions to which CoC grant recipients and subrecipients must agree in their agreements. 24 C.F.R. §§ 578.19(b), 578.23(c).

38.     Recipients of funds under the CoC program must also comply with statutory and regulatory nondiscrimination requirements. For instance, HUD's Equal Access Rule applies to

CoC-funded programs and requires, among other things, that grantees provide individuals equal access to programs, shelters, benefits, services, and accommodations "in accordance with the individual's gender identity," "place[], serve[], and accommodate[]" individuals "in accordance with the[ir] gender identity," "not subject[]" individuals "to intrusive questioning" or ask them to provide evidence of their gender identity, and place individuals in facilities with shared sleeping quarters or bathing facilities according to their gender identity. 24 C.F.R. § 5.106.

39.     Additional statutes and regulations also constrain HUD's administration of financial assistance programs more generally.

40.     Under the HUD Reform Act of 1989, at least 30 days before any deadline to apply for a grant, HUD must publish the criteria by which it will select awardees. 42 U.S.C. § 3545(a)(3). This requirement can be waived only if "required for appropriate response to an emergency." *Id.* § 3545(a)(5).

41.     HUD has also adopted regulations requiring it to proceed by notice-and-comment rulemaking including for "matters that relate to . . . grants," "even though such matters would not otherwise be subject to rulemaking by law or Executive policy." 24 C.F.R. § 10.1 ("It is the policy of the Department of Housing and Urban Development to provide for public participation in rulemaking with respect to all HUD programs and functions, including matters that relate to public property, loans, grants, benefits, or contracts . . . ."); *Id.* § 10.2 (definition of "rule"); *Id.* §§ 10.7–10.10 (notice-and-comment procedures); *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 447, 448 (9th Cir. 1994). While the regulation has an exception for "statements of policy, interpretative rules, rules governing the Department's organization or its own internal practices or procedures, or if a statute expressly so authorizes," it does not have an exception for substantive rules. *See* 24 C.F.R. § 10.1.

**D.  HUD imposes new eligibility and selection criteria for CoC Builds grants.**

42.    HUD has manufactured an extreme time crunch by waiting until the last minute to make CoC Builds awards, despite having previously solicited and received eligible and meritorious applications.

43.    In particular, HUD previously solicited applications for grants funded by Congress's 2022 appropriation for construction or rehabilitation of permanent supportive housing—named "CoC Builds" grants—two times, but did not make any awards either time.

44.    First, HUD published a notice of funding opportunity (NOFO) for the CoC Builds grants in July 2024, with an application deadline of December 5, 2024. Although HUD received and reviewed applications, it did not complete the process of making awards before the Administration changed on January 20, 2025. The new Administration did not make awards from the existing application pool.

45.    HUD then published a new NOFO to solicit applications for the CoC Builds grants on May 16, 2025, with an application deadline of June 26, 2025.

46.    HUD received and reviewed applications in response to that NOFO, made selections, and even notified Congress of who the agency had selected for awards. Yet, without explanation, the agency never notified the awardees or executed any grant agreement.

47.    Then, on September 5, 2025—less than one month before the $75 million in appropriated funds are set to expire—HUD published a new NOFO for the CoC Builds grants, this time with an unprecedented (and unlawful) one-week deadline for applications, requiring submissions by September 12. (Funding Opportunity Number FR-6902-N-25A, available at https://simpler.grants.gov/opportunity/23e87946-467a-486f-b6c5-db8c6b3c2317.) The September 5 NOFO is appended as Exhibit A to this Complaint.

48.     It is nearly impossible for applicants to prepare application materials on that short timeframe, particularly given that the September 5 NOFO requires funded programs to focus on medical respite for elderly individuals and individuals with a physical disability, while the prior NOFOs did not require that focus. That change would require applicants to make dramatic shifts in their previously prepared project proposals. This change alone could trigger new and substantial architectural and engineering services; new regulatory approvals from local planning and zoning boards; approvals from local emergency management and transportation departments; approvals from local building and fire officials; and reviews from local historical preservation associations.

49.     This additional work is exclusive of all the preliminary funding commitments an applicant would need to secure. For example, Plaintiff WDC secured additional funding commitments that provide over 75% of the funding to support the WDC CoC Builds FY2025 project under the May 2025 NOFO.

50.     The September 5 NOFO states that HUD expects to make around eight awards.

51.     The September 5 NOFO imposes multiple new eligibility and selection criteria unrelated to achieving the purposes of the grant program and designed instead to further the Administration's separate policy goals.

52.     The NOFO imposes multiple criteria designed to exclude projects based in any state, county, or city with policies the Administration disfavors (collectively, Jurisdiction Criteria). In particular, the NOFO requires that the proposed project be located in a jurisdiction (state, county, city) that:

   a.     Prohibits public camping or loitering and enforces that prohibition (Camping Enforcement Jurisdiction Criterion);

b.    Prohibits public illicit drug use and enforces that prohibition (Drug Enforcement Jurisdiction Criterion);

c.    Prohibits urban squatting and enforces that prohibition (Squatting Enforcement Jurisdiction Criterion);

d.    Cooperates with federal immigration enforcement (Immigration Enforcement Jurisdiction Criterion);

e.    "Utilizes standards that address individuals who are a danger to themselves or others" (Involuntary Commitment Jurisdiction Criterion); and

f.    "Substantially implements and complies with SORNA, particularly in the case of registered sex offenders with no fixed address, including by adequately mapping and checking the location of homeless sex offenders" (SORNA Jurisdiction Criterion).

53.    The NOFO also imposes multiple criteria based on the applicant's own activities, including activities outside the scope of the funded program (collectively, Applicant Criteria). In particular, the applicant must state that:

a.    It "does not," and "will not," "operate drug injection sites or 'safe consumption sites,' knowingly distribute drug paraphernalia on or off of property under their control, permit the use or distribution of illicit drugs on property under their control, or conduct any of these activities under the pretext of 'harm reduction'" (Safe Drug Use Criterion); and

b.    It "does not and will not deny the sex binary in humans or promote the notion that sex is a chosen or mutable characteristic" (Sex Binary Criterion).

54.     The NOFO establishes a three-step process for reviewing awards, with unlawful new criteria at each step, and often with the same criteria appearing at multiple steps.

55.     First is the "threshold review" step, at which HUD reviews each application to make sure it meets specified "threshold requirements." If an applicant meets all threshold requirements, it will advance to the next step. If it does not meet all threshold requirements, the application is not eligible for funding.

56.     The "threshold" requirements include requirements that categorically disqualify projects based in state and local jurisdictions with policies the Administration disfavors. In particular, the "threshold" requirements include the Camping Enforcement Jurisdiction Criterion, the Drug Enforcement Jurisdiction Criterion, the Squatting Enforcement Jurisdiction Criterion, and the Immigration Enforcement Jurisdiction Criterion.

57.     Second is the "merit review" step. For this step, applicants must indicate—with a "yes" or "no" answer—whether they satisfy so-called "merit criteria."

58.     The criteria at the "merit review" step include multiple requirements—both Jurisdiction Criteria and Applicant Criteria—that advance the Administration's unrelated ideological goals at the expense of the purposes of the program Congress created. In particular, the "merit" criteria include Camping Enforcement Jurisdiction Criterion, the Drug Enforcement Jurisdiction Criterion, the Immigration Enforcement Jurisdiction Criterion, the Involuntary Commitment Jurisdiction Criterion, and the SORNA Jurisdiction Criterion, as well as the Safe Drug Use Criterion and Sex Binary Criterion.

59.     Third, HUD conducts a "risk review," ostensibly to evaluate each applicant's likelihood of successfully implementing an award.

60.     The "risk review" looks at factors like the applicant's financial stability, history of performance, audit findings, and staffing structure. But the September 5 NOFO's "risk review" criteria also look to the "[e]xistence of evidence" that the applicant meets the Safe Drug Use Criterion and Sex Binary Criterion.

61.     The NOFO states that HUD will make awards to the first applicants who meet the "threshold" criteria and answer "yes" to all the "merit" criteria, in the order of submission timestamp. It does not state how HUD intends to apply the "risk review" criteria.

62.     The New Criteria prescribe policy and are a rule subject to notice-and-comment requirement under HUD's regulations, 24 C.F.R. § 10.1, 10.2(a), yet HUD did not undertake notice and comment in adopting them.

63.     The practical effect of the New Criteria and HUD's selection process is that applicants will not receive funding, or even have a chance to compete for it, if they operate in states or other jurisdictions with policies the Administration disfavors or if they themselves engage in activities or express viewpoints that the Administration dislikes.

**E.  Plaintiffs are irreparably harmed by HUD's new criteria for CoC Builds funding.**

64.     HUD's new criteria injures many Alliance members by depriving them of a fair opportunity to compete for CoC Builds funding in one of two ways.

65.     *First*, the Jurisdictional Criteria render many Alliance members ineligible for reasons entirely outside of their control. Namely, such members are ineligible simply because their projects are located in jurisdictions that have adopted policies that the administration does not like—on issues that range from immigration to drug use.

66.     Many of these members would apply for the CoC Builds grants under the September 5 NOFO, but are unable to do so—or are unable to have a fair opportunity to compete—because of the Jurisdictional Criteria.

67.     Under either scenario, Alliance members are ineligible if their proposed projects are located in any state that HUD would deem to fail to meet one or more of the Jurisdictional Criteria mentioned above. While the vagueness of the criteria make it difficult to identify every jurisdiction that is excluded, the Department of Justice has compiled a list of "sanctuary jurisdictions" (which the Department has concluded are not cooperating with the federal government on immigration enforcement), as well as a list of jurisdictions that have not substantially implemented SORNA. On information and belief, HUD will consider projects that are located in states appearing on those lists to be ineligible for CoC Build funds under the Jurisdiction Criteria. In addition to Puerto Rico and the District of Columbia, those states include:

    a.    Alaska;

    b.    Arizona;

    c.    Arkansas;

    d.    California;

    e.    Colorado;

    f.    Connecticut;

    g.    Delaware;

    h.    Georgia;

    i.    Hawaii;

    j.    Idaho;

    k.    Illinois;

    l.    Indiana;

    m.    Iowa;

n.    Kansas;

o.    Kentucky;

p.    Maine;

q.    Massachusetts;

r.    Minnesota;

s.    Montana;

t.    Nebraska;

u.    Nevada;

v.    New Hampshire;

w.    New Jersey;

x.    New Mexico;

y.    New York;

z.    North Carolina;

aa.    North Dakota;

bb.    Oregon;

cc.    Pennsylvania;

dd.    Rhode Island;

ee.    Texas;

ff.    Utah;

gg.    Vermont;

hh.    Washington;

ii.    West Virginia; *and*

jj.    Wisconsin.

68.    The Alliance has members located throughout the above states, many of whom would compete for the CoC Builds funding but are now unable to compete fairly under the New Criteria.

69.    For example, Alliance Member WDC proposed a project located in Rhode Island under the May 2025 NOFO.

70.    HUD notified members of Congress that WDC was selected for an award under the May 2025 NOFO.

71.    However, under the new September 5 NOFO, WDC is now ineligible for the CoC Builds funding because the project is located in Rhode Island—a jurisdiction that HUD likely would deem not to meet various Jurisdiction Criteria, including the Immigration Enforcement Jurisdiction Criteria and the SORNA Jurisdiction Criteria. Thus, although WDC would like to compete for the CoC Build funds under the September 5 NOFO, WDC cannot do so, or cannot be fairly considered, as a direct result of the Jurisdiction Criteria.

72.    *Second*, other Alliance members who would like to compete for the CoC Build funds are now ineligible because they do not meet one or both of the unlawful Applicant Criteria. Because of the Applicant Criteria, such members will now either forgo applying altogether or they will be effectively disqualified when they submit their application.

73.    For example, Alliance member WDC would like to apply for the funds, but is effectively ineligible because it does not meet the Sex Binary Merit Criterion. Specifically, WDC recognizes and provides culturally appropriate services to transgender and non-binary people according to their gender identity.

74.    Absent preliminary relief, these members will be irreparably harmed because they will be irretrievably deprived of the opportunity to compete for these funds. As noted, the NOFO

was published on September 5, applications are due on September 12, and HUD intends to award funds to the first approximately eight applicants who answer "yes" to the Merits Criteria, and to obligate those funds by September 15.

75.    Absent immediate relief, that application process will conclude tomorrow and the funds will be obligated to other recipients imminently, thus permanently depriving Alliance members of the opportunity to compete for the CoC Build funds.

76.    Beyond injuries to its members, the Alliance has also suffered a direct injury in the form of an increased demand on its services, resulting in diverted resources and the loss of valuable staff time.

77.    The Alliance serves its members by (1) providing members with research and analysis on solutions to end homelessness; (2) offering intensive, on-the-ground technical assistance tailored to its members' local needs; and (3) convening members across the country— through annual conferences and other fora—to share best practices regarding how to end homelessness.

78.    The Alliance also offers its members specific services regarding the Department of Housing and Urban Development (HUD) Continuum of Care (CoC) grant program, including analysis and trainings on HUD's priorities in the grant program. Such services facilitate the ability of Alliance members to compete for and comply with grants issued under the program.

79.    In addition to formal webinars and trainings, the Alliance answers requests from members for analysis on the CoC grant program priorities. These requests are received by email, phone, and through a Facebook group called the "Hub."

80.    Since the September 5 NOFO, requests from Alliance members for analysis on the CoC program—and the September 5 NOFO in particular—have skyrocketed. Indeed, nine

Alliance Staff have spent no less than 169 hours collectively answering questions and requests related to the September 5 NOFO. This valuable staff time is being diverted away from other important work at the Alliance.

81.    In fielding calls from the September 5 NOFO, the Alliance has learned the following: many potential applicants do not feel like they can meet the criteria established in the NOFO; understanding HUD's goals for this funding is challenging because even key terms used in the NOFO are undefined; one week is not enough time to develop high-quality projects and get required approvals from government officials or other required approvers; the application period does not allow for enough time to secure adequate funding to match the level of supportive services required; some applicants feel like their time has been wasted by HUD given the previous two application rounds; that the NOFO criteria disadvantages organizations that have the most experience to take on this type of project; and that many applicants from previous rounds will not apply again.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the Administrative Procedure Act: In Excess of Statutory Authority (All New Criteria)

82.    The paragraphs above are incorporated and reasserted as if fully set forth here.

83.    The Administrative Procedure Act (APA) provides that a court "shall" "hold unlawful and set aside agency action" found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

84.    An agency action is reviewable under the APA if it is a final agency action. 5 U.S.C. § 704. An agency action is final if it "mark[s] the consummation of the agency's decisionmaking process" and is an action by which "rights or obligations have been determined,

or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 156, 177–78 (1997) (cleaned up).

85.     Defendants have made a final decision to impose the New Criteria for applying for CoC Builds grants. Those New Criteria are final agency action reviewable under 5 U.S.C. § 704, as they determine applicants' rights and obligations and produce legal consequences by excluding applicants from eligibility, or otherwise disadvantaging their applications, if they do not meet the criteria.

86.     No statute authorizes Defendants to withhold CoC Builds funding from projects in states and localities that do not implement the Administration's ideological and policy agenda or to otherwise adopt any of the New Criteria. Defendants therefore acted in excess of their statutory authority in imposing them.

87.     The New Criteria must be declared unlawful and set aside as "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

## COUNT II
### Violation of the Administrative Procedure Act: Arbitrary and Capricious (All New Criteria)

88.     The paragraphs above are incorporated and reasserted as if fully set forth here.

89.     The APA provides that a court "shall" "hold unlawful and set aside agency action" found to be "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

90.     Defendants provided no reasoned explanation for their decision to adopt the New Criteria.

91.     Defendants failed to acknowledge their departure from past policies or explain the reasons for their change in policy in imposing the New Criteria.

92.     Defendants ignored factors that Congress required them to consider and considered factors that Congress did not permit them to consider.

93.    In imposing the New Criteria, Defendants have failed to consider multiple important aspects of the problem. There is no indication that Defendants considered best practices in homelessness policy, detrimental impact of the New Criteria on the communities served by grantees, any alternative more limited policy change, or grantees' reasonable reliance on the opportunity to compete for the funds or the reliance interests of communities served by grantees.

94.    The Jurisdiction Criteria are also arbitrary and capricious because they are so vague that they do not give grantees adequate notice of how to determine whether they meet them and invite arbitrary implementation by Defendants. Defendants also did not consider the effect that would have on prospective applicants, including by causing confusion that deters them from applying for fear of making a false statement.

95.    The Sex Binary Criterion is also arbitrary and capricious because it conflicts with the Fair Housing Act, Title VII, and binding agency regulations, yet Defendants fail to acknowledge or address those conflicts.

96.    The New Criteria must be declared unlawful and set aside as arbitrary and capricious.

## COUNT III
### Violation of the Administrative Procedure Act: Contrary to Constitutional Right (All New Criteria)

97.    The paragraphs above are incorporated and reasserted as if fully set forth here.

98.    The Administrative Procedure Act (APA) provides that a court "shall" "hold unlawful and set aside agency action" found to be "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C.§ 706(2)(B).

99.    As described in Counts V-VII and IX, the New Criteria violate multiple constitutional commands, including the First Amendment, the Spending Clause, the Tenth

Amendment, and the constitutional separation of powers and associated constitutional provisions.

100.    The New Criteria must be declared unlawful and set aside as "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

**COUNT IV**
**Violation of the Administrative Procedure Act: Not in Observance of Procedure Required By Law (All New Criteria)**

101.    The paragraphs above are incorporated and reasserted as if fully set forth here.

102.    The Administrative Procedure Act (APA) provides that a court "shall" "hold unlawful and set aside agency action" found to be "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

103.    The requirement to observe procedure "required by law" includes not just procedures required by governing statutes, but also procedures required by the agency's own regulations.

104.    Defendants did not publish the criteria for selecting awardees at least 30 days before the deadline to apply, as required by the HUD Reform Act, 42 U.S.C. § 3545(a)(3). No emergency justified that failure.

105.    Defendants also did not comply with the requirement in the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, which HUD has adopted, 24 C.F.R §§ 84, 85, that no funding opportunity be available for less than 30 calendar days absent exigent circumstances. 2 C.F.R. § 200.204 (previously codified at § 200.203).

106.    The New Criteria imposed on applications for CoC Builds grants comprise a substantive rule, but HUD did not comply with the notice-and-comment requirements set forth in

its own regulations, and thus failed to observe procedures required by HUD regulations, 24

C.F.R. § 10.1.

107.    The New Criteria must be declared unlawful and set aside as "without observance

of procedure required by law." 5 U.S.C. § 706(2)(D).

**COUNT V**
**Violation of the Separation of Powers (All New Criteria)**

108.    The paragraphs above are incorporated and reasserted as if fully set forth here.

109.    This Court has inherent equitable power to enjoin executive conduct that violates

the Constitution, including the separation of powers. *See Free Enter. Fund v. Pub. Co. Acct.*

*Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

110.    The Constitution empowers Congress to make laws, U.S. Const. art. I, § 1, and to

control federal spending, U.S. Const., art. I, § 8, cl. 1; *id.*, § 9, cl. 7, and it requires the President

to faithfully execute those laws, *id.* art. II, § 3. The President lacks the unilateral authority to

modify or amend duly enacted Legislation—the President may only "approve all the parts of a

Bill, or reject it in toto." *Clinton v. City of New York*, 524 U.S. 417, 439–40 (1998) (citation

omitted); *see* U.S. Const. art. I, § 7, cl. 2. The President cannot delegate powers to other

executive branch officials that violate the Constitution.

111.    Duly enacted statutes establish the CoC grant program for specified purposes, and

Congress has appropriated funding for permanent supportive housing under the CoC grant

program. Nothing in those laws authorizes the Executive Branch to impose the New Criteria.

Defendants may not lawfully condition funding on the New Criteria, which are nowhere to be

found in statute and which Congress did not authorize Defendants to impose.

112.    Defendants' imposition of each New Criteria violates the separation of powers in

infringing on Congress' legislative authority and spending and appropriations power, in failing to

26

faithfully execute Congress's laws, and in attempting to amend, modify, or partially veto duly enacted legislation.

113.    To prevent Defendants' violations of the separation of powers, Defendants must be enjoined from implementing or enforcing each New Criteria.

## COUNT VI
### Violation of the Spending Clause (All New Criteria)

114.    The paragraphs above are incorporated and reasserted as if fully set forth here.

115.    This Court has inherent equitable power to enjoin executive conduct that violates the Constitution. *See Free Enter. Fund*, 561 U.S. at 491.

116.    The Spending Clause of the U.S. Constitution provides that "Congress"—not the Executive—"shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States . . . ." U.S. Const. art. I, § 8, cl. 1.

117.    Under the Spending Clause, funding restrictions may only impose conditions that are reasonably related to the federal interest in the project and the project's objectives, *South Dakota v. Dole*, 483 U.S. 203, 207, 208 (1987), and must not be so severe as to be coercive, *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577–78 (2012).

118.    Even if Congress had delegated authority to the Executive and HUD to condition CoC Builds grant funding on the policies of local jurisdictions or on the applicant's activities and viewpoints outside the scope of the funded program, the New Criteria would violate the Spending Clause because they are not germane to the stated purpose of HUD program funds. In addition, by barring organizations operating within jurisdictions with disfavored policies, the Jurisdiction Criteria unconstitutionally coerce those jurisdictions to adopt the Administration's agenda.

119.    To prevent Defendants' violations of the Spending Clause, Defendants must be enjoined from implementing or enforcing each New Criteria.

## COUNT VII
### Violation of the Tenth Amendment (All Jurisdiction Criteria)

120.    The paragraphs above are incorporated and reasserted as if fully set forth here.

121.    This Court has inherent equitable power to enjoin executive conduct that violates the Constitution. *See Free Enter. Fund*, 561 U.S. at 491.

122.    The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend X.

123.    Legislation that "coerces a State to adopt a federal regulatory system as its own" "runs contrary to our system of federalism." *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 577–78 (2012).

124.    The Jurisdiction Criteria violate the Tenth Amendment by imposing criteria that coerce states and localities to adopt the Administration's agenda as their own. The Jurisdiction Criteria do not just exclude the jurisdictions themselves from consideration—and allow the jurisdictions to determine whether to take the funds subject to the criteria or leave them—but exclude organizations operating within those jurisdictions from consideration as well. This blacklisting of organizations based in the targeted jurisdictions works greater coercion than merely imposing conditions on the jurisdictions themselves would. The Jurisdiction Criteria thus threaten to improperly commandeer state and local officials into adopting and implementing the Administration's favored policies.

125.    To prevent Defendants' violations of the Tenth Amendment, Defendants must be enjoined from implementing or enforcing each Jurisdiction Criteria.

## COUNT VIII
## Violation of the Administrative Procedure Act: Contrary to Law (Sex Binary Criterion)

126.    The paragraphs above are incorporated and reasserted as if fully set forth here.

127.    The Administrative Procedure Act (APA) provides that a court "shall" "hold unlawful and set aside agency action" found to be "not in accordance with law." 5 U.S.C. § 706(2)(A).

128.    The Sex Binary Criterion is contrary to the Fair Housing Act and Title VII, which prohibit discrimination in housing and employment, respectively, on the basis of sex, including gender identity. 42 U.S.C. § 3604(a)-(b), 42 U.S.C. §2000e–2(a)(1); *see also Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020) (interpreting Title VII to prohibit discrimination based on gender identity); *see also Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519 (2015) (likening Fair Housing Act's sex discrimination provisions to those of Title VII).

129.    The Sex Binary Criterion is also contrary to HUD regulations requiring that, in CoC programs, individuals be treated in accordance with their gender identity. *See* 24 C.F.R. § 5.106.

130.    The Sex Binary Criterion must be declared unlawful and set aside as contrary to law.

## COUNT IX
## Violation of the First Amendment – Free Speech Clause (Sex Binary Criterion)

131.    The paragraphs above are incorporated and reasserted as if fully set forth here.

132.    This Court has inherent equitable power to enjoin executive conduct that violates the Constitution. *See Free Enter. Fund*, 561 U.S. at 491.

133.    The First Amendment to the United States Constitution provides that the government "shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.

134.    While the government may in some circumstances attach conditions to federal funding that "affect the recipient's exercise of its First Amendment rights," there are limits. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15 (2013). The government may not restrict "protected [speech] outside the scope of the federally funded program." *Id.* at 217 (citing *Rust v. Sullivan*, 500 U.S. 173, 197 (1991)). In addition, even in providing what recipients may do with government funding, "the Government may not aim at the suppression of dangerous ideas." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998) (cleaned up). And where the government imposes a funding condition "not relevant to the objectives of the program," that can violate the First Amendment. *See All. For Open Soc'y*, 570 U.S. at 214.

135.    The Sex Binary Criterion runs afoul of those limits.

136.    The Sex Binary Criteria imposes a viewpoint-based bar on applicants that "deny the sex binary in humans or promote the notion that sex is a chosen or mutable characteristic"—that is, applicants who express a viewpoint that the Administration disfavors. This curtails applicants' speech outside the scope of the federally funded program and punishes applicants based on that speech.

137.    The Sex Binary Criterion also has no relevance to the CoC Builds program's purposes of creating permanent supportive housing for individuals and families experiencing homelessness, but rather aims at the suppression of an idea with which the Administration disagrees. That censorious purpose and lack of relation to the objectives of the CoC program additionally render it unconstitutional under the First Amendment.

138. No compelling government interest justifies Defendants' viewpoint-based targeting of speech, and the Sex Binary Criterion is not the least restrictive means available to advance whatever interest the criteria serve.

139. The Sex Binary Criterion violates the First Amendment, and Defendants must be enjoined from enforcing or implementing it.

## COUNT X
### Ultra Vires (All New Criteria)

140. The paragraphs above are incorporated and reasserted as if fully set forth here.

141. This Court has inherent equitable power to enjoin and declare unlawful executive ultra vires conduct. *R.I. Dep't of Env't Mgmt. v. United States*, 304 F.3d 31, 42 (1st Cir. 2002). An agency acts ultra vires when it "plainly acts in excess of its delegated powers." *Fresno Cmty. Hosp. & Med. Ctr. v. Cochran*, 987 F.3d 158, 162 (D.C. Cir. 2021) (cleaned up).

142. No statute, constitutional provision, or other source of law authorizes Defendants to impose the New Criteria.

143. The New Criteria are ultra vires, and Defendants must be enjoined from implementing or enforcing them.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

A. Declare unlawful, vacate, and set aside the New Criteria;

B. Preliminarily and permanently enjoin Defendants, their agents, and all persons acting in concert or participation with Defendants from imposing or implementing the New Criteria, or any substantively similar criteria, on any HUD CoC awards in any manner, including by requiring applicants to meet the criteria to be considered for an award or to

receive an award, by considering those criteria in selecting awardees, or by requiring grantees to comply with such criteria upon obtaining an award;

C.  Stay the New Criteria pursuant to 5 U.S.C. § 705 and issue all other necessary and appropriate process to preserve status or rights pending conclusion of the review proceedings;

D.  Exercise its inherent equitable authority to preserve the appropriated CoC Builds funds for award past their expiration date pending resolution of this matter;

E.  Award Plaintiffs reasonable costs and attorneys' fees; and

F.  Grant any other relief that the Court deems fit and proper.


September 11, 2025                                   Respectfully submitted,

                                                    /s/ Amy R. Romero
                                                    Amy R. Romero (RI Bar # 8262)
                                                    Kevin Love Hubbard (MA Bar #704772)^
                                                    DeLuca, Weizenbaum, Barry & Revens, Ltd.
                                                    199 North Main Street
                                                    Providence, RI 02903
                                                    (401) 453-1500
                                                    Amy@dwbrlaw.com
                                                    Kevin@dwbrlaw.com
                                                    Cooperating counsel, Lawyers' Committee for RI

                                                    /s/ Kristin Bateman
                                                    Kristin Bateman (Cal. Bar No. 270913)[+][^]
                                                    Yenisey Rodriguez (D.C Bar No. 1600574)^
                                                    Kristen Miller (D.C. Bar No. 229627)^
                                                    Robin F. Thurston (D.C. Bar No. 1531399)^
                                                    Democracy Forward Foundation
                                                    P.O. Box 34553
                                                    Washington, D.C. 20043
                                                    (202) 448-9090
                                                    kbateman@democracyforward.org
                                                    yenisey.rodriguez@democracyforward.org
                                                    consultantkmiller@democracyforward.org
                                                    rthurston@democracyforward.org

*/s/ Antonia K. Fasanelli*
Antonia K. Fasanelli (DC Bar No. 481856)[^]
National Homelessness Law Center
1400 16th Street, NW, Suite 425
Washington, DC  20036
(202) 638-2535
afasanelli@homelesslaw.org

*/s/ Lynette Labinger*
Lynette Labinger (RI Bar No. 1645)
128 Dorrance St., Box 710
Providence, RI 02903
(401) 465-9565
ll@labingerlaw.com
Cooperating counsel, ACLU Foundation of RI


*Counsel for Plaintiffs*

[^] *Pro hac vice* motion forthcoming
[+] Not admitted in the District of Columbia. Practice supervised by members of the D.C. bar.