## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

NATIONAL ALLIANCE TO END
HOMELESSNESS., *et al.*,

        *Plaintiffs*,

v.

SCOTT TURNER, in his official capacity as
Secretary of the United States Department of
Housing and Urban Development, *et al.*,

        *Defendants*.

Case No. 25-447

## MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 3

    A. The Administration's strategy of leveraging federal funding to advance unrelated policy goals and to punish jurisdictions with disfavored policies ................................. 3

    B. HUD's Continuum of Care grant program ........................................................... 7

    C. Statutes and regulations governing the CoC grants ............................................. 8

    D. New Criteria for CoC Builds grants ................................................................... 10

    E. The New Criteria's Impact on Plaintiffs ............................................................ 13

LEGAL STANDARD ......................................................................................................... 15

ARGUMENT ...................................................................................................................... 15

    I. The Alliance Is Likely To Succeed on the Merits. ............................................... 15

        A. The New Criteria Violate the APA .................................................................. 15

            1.    The New Criteria are final agency action. ................................................. 16

            2.    The New Criteria exceed Defendants' statutory authority. ....................... 17

            3.    The New Criteria are arbitrary and capricious ......................................... 18

            4.    HUD failed to follow required procedure in imposing the New Criteria. ... 21

        B. The New Criteria Violate Multiple Constitutional Provisions Safeguarding the Separation of Powers ...................................................................................... 22

        C. The Jurisdiction Criteria Violate the Tenth Amendment ................................. 23

        D. The Sex Binary Criterion Violates the First Amendment ................................ 24

    II. Plaintiffs Will Suffer Irreparable Injury Absent Emergency Relief. ................... 25

    III. The Balance of the Equities and Public Interest Favor a TRO. .......................... 29

CONCLUSION ................................................................................................................... 31

## INTRODUCTION

Last Friday, September 5, the Department of Housing and Urban Development (HUD) issued a notice of funding opportunity that solicits applications for grants to build much needed housing for homeless individuals and families—but blackballs otherwise meritorious projects based on compliance with the Administration's ideological agenda. HUD intends to allocate these limited funds on a first-come, first-served basis only to projects in jurisdictions aligned with the Administration's broader policy goals and to applicants that will commit to them. And despite having previously identified qualified applicants, HUD is recompeting these funds under these new criteria for a 7-day period, planning to make awards by this Monday, September 15. Both the process and substance of this new award process are shockingly unlawful and irreparably injure qualified applicants for these funds and the communities they serve, including Plaintiffs, the National Alliance to End Homelessness, on behalf of its members, and the Women's Development Corporation, a Rhode Island nonprofit that develops and operates quality, affordable housing.

This Court should immediately grant a temporary restraining order to preserve the status quo and ensure the Court will be able to grant effective relief. In particular, it should bar HUD from obligating the funds based on the new criteria and suspend the funds' expiration, which would otherwise occur on September 30, so that the funds are not irretrievably lost while the Court considers the merits of Plaintiffs' claims that the new criteria transgress a host of constitutional, statutory, and regulatory limits.

With the new criteria, HUD is leveraging federal funding to coerce organizations addressing homelessness, and their states and localities, into carrying out the Administration's ideological and policy goals. Congress appropriated $75 million for HUD to award to nonprofits,

states, or localities to build permanent supportive housing for unhoused individuals and families. HUD solicited applications for these awards twice already, most recently in May of this year—well in advance of the September 30 deadline. It reviewed the applications, selected awardees, and even went so far as to notify members of Congress of the selections. But before actually making the awards, HUD saw a chance to use these funds to advance a separate agenda. It started the grant award process over and, just last Friday, issued a new notice of funding opportunity with new eligibility criteria (and an unprecedented, and unlawful, one-week deadline) that advance various Administration goals—including by pressuring states and localities to help enforce federal immigration law, to cede to the Administration's wishes on local homelessness policies, and to carry out other parts of the executive branch agenda, and by barring those applicants who hold different views.

In particular, the new notice categorically disqualifies from consideration any entity seeking to build housing in a jurisdiction with policies the Administration disfavors. And, even in jurisdictions with policies the Administration deems acceptable, entities effectively cannot compete for funding unless they profess agreement with the Administration's view that sex is binary and immutable and foreswear operating safe injection sites or similar programs designed to reduce the harm from drug use—even with wholly non-federal funds.

HUD does not have authority to do this—and the Constitution does not permit it. In our constitutional system, Congress controls the purse strings and decides what funding to provide, for what purposes, and under what criteria. And states and localities decide what policies to adopt and implement in their own local jurisdictions. HUD has transgressed both these bounds. Congress did not authorize HUD to impose these criteria, and HUD exceeds its statutory authority and violates the separation of powers in imposing them. HUD has likewise

impermissibly trenched on states' and localities' powers by coercing them to abandon the policies their own citizens have chosen and to implement the Administration's ideological and policy agenda instead. The new criteria conflict also with federal statutes and regulations, violate constitutional rights, did not go through required procedures, and are arbitrary and capricious to boot.

The Court should grant a temporary restraining order (1) to prevent HUD from awarding funds under its unlawful new criteria and (2) to preserve the status quo so that the funds remain available to award, under permissible criteria, past the current September 30 expiration date. That modest relief will ensure this case does not become moot before this Court has a chance to adjudicate the merits. Without that relief, Plaintiff's members—many of whom are categorically ineligible under the challenged criteria and who cannot meet other criteria without forsaking their core values—will irretrievably lose the opportunity to compete for this funding. The balance of equities favor this relief, as the government suffers no meaningful harm from waiting to award the funds, and the public interest can only benefit from an orderly process that ensures that all applicants have a fair opportunity to compete for these funds.

## BACKGROUND

### A. The Administration's strategy of leveraging federal funding to advance unrelated policy goals and to punish jurisdictions with disfavored policies

Upon taking office in January 2025, President Trump issued a series of executive orders that aim to effect sweeping social changes, including by leveraging federal funding to coerce federal grantees to fall into line with the Administration's ideological and policy agenda.

One top target has been states and localities that the Administration deems insufficiently cooperative with federal immigration enforcement. Through a series of executive orders starting on his first day in office, the President has instructed federal agencies to "ensure that so-called

3

'sanctuary' jurisdictions … do not receive access to Federal funds." *Protecting the American People Against Invasion* § 17, Exec. Order No. 14159, 90 Fed. Reg. 8443, 8446 (Jan. 20, 2025); *see also Ending Taxpayer Subsidization of Open Borders* § 2(a), Exec. Order No. 14218, 90 Fed. Reg. 10581,10581 (Feb. 19, 2025) (similar); *Protecting American Communities from Criminal Aliens* § 3(a), Exec. Order No. 14287, 90 Fed. Reg. 18761, 18761, (Apr. 28, 2025) (similar). Pursuant to one such order, the Attorney General has published a list of "sanctuary jurisdictions"—"States and local jurisdictions" that the Administration deems to "obstruct the enforcement of Federal immigration laws." *See Protecting American Communities from Criminal Aliens* § 2, 90 Fed. Reg. 18761, 18761 (Apr. 28, 2025); Press Release, Dep't of Just. Off. of Pub. Affs., Justice Department Publishes List of Sanctuary Jurisdictions (Aug. 5, 2025), https://perma.cc/VS2J-RYYH. And the President has instructed agencies to take action against the jurisdictions on that list, including by suspending or terminating federal funds. *Id.* § 3(a). The State of Rhode Island, among others, is on that list.

The Administration has also set its sights on unhoused people's rights. On July 24, 2025, the President issued an executive order titled "Ending Crime and Disorder on America's Streets" that portrays homelessness as a criminal issue rather than a societal challenge requiring systemic solutions. Exec. Order No. 14321, 90 Fed. Reg. 35817 (Jul. 29, 2025) (Unhoused People Order). Without citing any evidence, the Order declares that "[t]he overwhelming majority" of "individuals living on the streets in the United States" "are addicted to drugs, have a mental health condition, or both." *Id.* The Order also declares that the "failed programs that address homelessness" have left "other citizens vulnerable to public safety threats." *Id.* The Order does not acknowledge or consider evidence that people living on the streets without a home are actually the ones more likely to be victims of violent crime. Michelle S. Tong, et al., *Persistent*

*Homelessness and Violent Victimization Among Older Adults in the HOPE HOME Study*, J Interpers Violence 1, 1 (Sept. 2021), https://perma.cc/REZ8-VDRD.

The Order calls for HUD and the Department of Health and Human Services (HHS) to "end[] support for 'housing first' policies"—that is, policies that prioritize providing housing to unhoused people while also offering, but not mandating, supportive services to address underlying issues such as drug use or mental health conditions—because, the Order asserts, "they deprioritize accountability and fail to promote treatment, recovery, and self-sufficiency." Unhoused People Order § 5. The Order also takes aim at "drug injection sites" or "safe consumption" sites that aim to reduce the harm from drug use, asserting (again without evidence) that they "only facilitate illegal drug use and its attendant harm." *E.g.*, *id.* § 4. Among other things, the Order directs HHS not to fund such sites, *id.* § 4(a)(i); directs the Attorney General to consider prosecuting such organizations for operating "drug-involved premises," 21 U.S.C. § 856, Unhoused People Order § 5(c)(1); and directs HUD to review whether recipients that operate such harm reduction sites are in violation of the terms of their awards and to "freeze" their funding as appropriate, *id.* § 5(c)(2). The Order also encourages the involuntary institutionalization of unhoused people by, among other things, directing the Attorney General to provide technical assistance and grants to states to adopt and implement "maximally flexible" civil commitment and related standards that facilitate commitment of individuals with mental illness or who "are living on the streets and cannot care for themselves." *Id.* § 2(a).

In addition, the Order makes various directives designed to pressure states and localities to adopt and implement homelessness policies at the local level that align with the Administration's views. In particular, the Order instructs various agencies, including HUD, to prioritize giving federal funding to grantees based on the policies of the states and municipalities

in which they are located. Under the Order, preference should go to jurisdictions that enforce prohibitions on "open illicit drug use," on "urban camping and loitering," and on "urban squatting"; that adopt and enforce standards to commit "individuals who are a danger to themselves or others" or cannot care for themselves; and that substantially implement the Sex Offender Registry Notification Act (SORNA), including by adequately tracking "homeless sex offenders." *Id.* § 3.

The Administration has also launched a broadside attack on the rights and dignity of transgender people. On January 30, the President issued Exec. Order No. 14168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." 90 Fed. Reg. 8615 (Jan. 30, 2025) ("Gender Ideology" Order). That Order announces that "the policy of the United States" is "to recognize two sexes, male and female," that are "not changeable and are grounded in fundamental and incontrovertible reality." *Id.* § 2. It decries "the erasure of sex" in both "policy" and "language," and it commits to using what the Administration considers "accurate language and policies that recognize women are biologically female, and men are biologically male." *Id.* § 1.

Among other directives, the Order requires federal agency heads to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology" and to "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." *Id.* §§ 3(e), (g). The Order defines "gender ideology" as an ideology that "replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity" and "includes the idea that there is a vast spectrum of genders that are disconnected from one's sex." *Id.* § 2(f). The Order disparages this viewpoint as "false" and "internally inconsistent." *Id.*

**B.  HUD's Continuum of Care grant program**

Congress enacted the McKinney-Vento Homeless Assistance Act (Homeless Assistance Act) in 1987 to establish a coordinated federal response to homelessness, including by providing funds for programs to assist homeless individuals and families. Pub. L. No. 100-77, § 102 (1987), *codified at* 42 U.S.C. § 11301(b). In 2009, Congress passed the Homeless Emergency Assistance and Rapid Transition to Housing (HEARTH) Act, which amended the Homeless Assistance Act to establish the Continuum of Care (CoC) program, which is designed to help individuals and families experiencing homelessness move into transitional and permanent housing, with the goal of long-term stability. Pub. L. No. 111-22, § 1301(2) (2009), *codified at* 42 U.S.C. § 11381. Congress created the CoC program "to promote community-wide commitment to the goal of ending homelessness," to support efforts by nonprofit providers and state and local governments "to quickly rehouse homeless individuals and families," to "promote access to, and effective utilization of, mainstream programs," and to "optimize self-sufficiency among individuals and families experiencing homelessness." 42 U.S.C. § 11381.

The CoC Program funds a variety of programs that help homeless individuals and families, including by constructing new housing units for permanent or transitional housing, rehabilitating structures to provide such housing, providing rental assistance, and offering supportive services such as child care, job training, healthcare, mental health services, trauma counseling, and life skills training. *Id.* §§ 11383(a), 11360(29). CoCs, the community-wide bodies responsible for coordinating homelessness response systems, provide essential services to millions of individuals and families experiencing homelessness.

In 2022, in addition to amounts appropriated for the CoC program generally, Congress appropriated $75 million for "one-time awards under the Continuum of Care program for new construction, acquisition, or rehabilitation of new permanent supportive housing." Pub. L. No.

117-328, div. L, tit. II, 136 Stat. 4459, 5160 (2022). The appropriations act specifies that "these amounts shall be awarded on a competitive basis, based on need and other factors to be determined by the Secretary, including incentives to establish projects that coordinate with housing providers, healthcare organizations and social service providers." *Id.* Those funds remain available until September 30, 2025. 136 Stat. at 5158.

### C. Statutes and regulations governing the CoC grants

Congress established statutory directives governing how HUD may administer the CoC Program and award CoC Grants, including delineating which activities are eligible for funding, selection criteria that HUD must apply to awards, and the program requirements that grantees must agree to as a condition of receiving funds. 42 U.S.C. §§ 11383, 11386a, 11386. For instance, the Homeless Assistance Act requires the HUD Secretary to establish certain "required" selection criteria that the Secretary must use to evaluate grant applications—like the applicant's track record in reducing the length of homelessness, helping homelessness individuals get jobs, and "other accomplishments … related to reducing homelessness." *Id.* § 11386a. The Act also specifies the "[r]equired agreements" to which grant recipients must agree to receive funds under the program. *Id.* § 11386(b). For instance, recipients must agree to operate funded projects in accordance with statutory requirements, to involve individuals experiencing homelessness in project operations where practicable, and to certify that children in family programs are enrolled in school and connected to services such as Head Start and Individuals with Disabilities Education Act programs. *Id.*

The Homeless Assistance Act also authorizes the HUD Secretary to promulgate regulations establishing other terms and conditions on grant funding and other selection criteria "to carry out [the CoC program] in an effective and efficient manner." *Id.* §§ 11386(b)(8); 11386a(b)(1)(G); 11387. Pursuant to this authority, HUD promulgated a Rule implementing the

Continuum of Care Program (CoC Rule). This Rule addresses "how to establish and operate a Continuum of Care, how to apply for funds under the program, and how to use the funds for projects approved by HUD," 77 Fed. Reg. 45422(Jul. 31, 2012), and sets forth application requirements and additional conditions to which CoC grant recipients and subrecipients must agree in their agreements. 24 C.F.R. §§ 578.19(b), 578.23(c).

Recipients of funds under the CoC program must also comply with statutory and regulatory nondiscrimination requirements. For instance, HUD's Equal Access Rule applies to CoC-funded programs and requires, among other things, that grantees provide individuals equal access to programs, shelters, benefits, services, and accommodations "in accordance with the individual's gender identity," "place[], serve[], and accommodate[]" individuals "in accordance with the[ir] gender identity, "not subject[]" individuals "to intrusive questioning" or ask them to provide evidence of their gender identity, and place individuals in facilities with shared sleeping quarters or bathing facilities according to their gender identity. 24 C.F.R. § 5.106.

Additional statutes and regulations also constrain HUD's administration of financial assistance programs more generally. Under the HUD Reform Act of 1989, at least 30 days before any deadline to apply for a grant, HUD must publish the criteria by which it will select awardees. 42 U.S.C. § 3545(a)(3). This requirement can be waived only if "required for appropriate response to an emergency." *Id.* § 3545(a)(5).

HUD has also adopted regulations requiring it to proceed by notice-and-comment rulemaking including for "matters that relate to . . . grants," "even though such matters would not otherwise be subject to rulemaking by law or Executive policy." 24 C.F.R. § 10.1 ("It is the policy of the Department of Housing and Urban Development to provide for public participation in rulemaking with respect to all HUD programs and functions, including matters that relate to

9

public property, loans, grants, benefits, or contracts . . . ."); *Id.* § 10.2 (definition of "rule"); *Id.* §§ 10.7–10.10 (notice-and-comment procedures); *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 447, 448 (9th Cir. 1994). While the regulation has an exception for "statements of policy, interpretative rules, rules governing the Department's organization or its own internal practices or procedures, or if a statute expressly so authorizes," it does not have an exception for substantive rules. *See* 24 C.F.R. § 10.1.

### D.  New Criteria for CoC Builds grants

Last Friday, September 5, HUD issued a notice of funding opportunity soliciting applications for CoC Builds grants, subject to new eligibility and selection criteria. The NOFO imposes a one-week deadline—a deadline that will be virtually impossible for many grantees to meet. Oliva Decl. ¶18-19. This time crunch is of HUD's own making. The grant funds are set to expire on September 30, Pub. L. No. 117-328, div. L, tit. II, 136 Stat. 4459, 5160 (2022), but HUD did not have to wait until now to solicit applications. In fact, it solicited applications twice already, most recently in May 2025. Oliva Decl. ¶¶14-16. It even performed a full review, made selections, and informed Congress who had won awards—but stopped short of issuing the awards. Oliva Decl. ¶17.

Instead, it issued a brand new NOFO for the third time last Friday, less than one month before the $75 million in funds for these grants will expire, and established an unprecedented selection process that imposes a host of new eligibility and selection criteria designed to advance the Administration's policy goals. *See* Compl. Ex. A (NOFO). The new criteria include criteria (collectively, New Criteria) designed to exclude projects based in any state, county, or city with policies the Administration disfavors (Jurisdiction Criteria), as well as criteria based on the applicant's own activities (Applicant Criteria).

10

As for the Jurisdiction Criteria, the NOFO requires that the proposed project be located in a jurisdiction (state, county, city) that:

a.  Prohibits public camping or loitering and enforces that prohibition (Camping Enforcement Jurisdiction Criteria);

b.  Prohibits public illicit drug use and enforces that prohibition (Drug Enforcement Jurisdiction Criteria);

c.  Prohibits urban squatting and enforces that prohibition (Squatting Enforcement Jurisdiction Criteria);

d.  Cooperates with federal immigration enforcement (Immigration Enforcement Jurisdiction Criteria);

e.  "Utilizes standards that address individuals who are a danger to themselves or others" (Involuntary Commitment Jurisdiction Criteria); and

f.  "Substantially implements and complies with SORNA, particularly in the case of registered sex offenders with no fixed address, including by adequately mapping and checking the location of homeless sex offenders" (SORNA Jurisdiction Criteria).

Compl. Ex. A at 22-23, 29-30. And the Applicant Criteria—which look beyond the scope of the federally funded program to *all* of the applicant's activities—require the applicant to state that:

a.  It "does not," and "will not," "operate drug injection sites or 'safe consumption sites,' knowingly distribute drug paraphernalia on or off of property under their control, permit the use or distribution of illicit drugs on property under their control, or conduct any of these activities under the pretext of 'harm reduction'" (Safe Drug Use Criteria); and

11

      b.  It "does not and will not deny the sex binary in humans or promote the notion that sex is a chosen or mutable characteristic" (Sex Binary Criteria).

*Id.* at 25, 30, 32-33.

The NOFO establishes a three-step process for reviewing awards, with unlawful new criteria at each step, and often with the same criteria appearing at multiple steps. *Id.* At 22-33. First is the "threshold review" step, at which HUD reviews each application to make sure it meets specified "threshold requirements." *Id.* at 22. If an applicant meets all threshold requirements, it will advance to the next step. *Id.* at 23, 33. If it does not meet all threshold requirements, the application is not eligible for funding. *Id.* at 22. The "threshold" requirements include requirements that categorically disqualify projects based in state and local jurisdictions with policies the Administration disfavors. In particular, the "threshold" requirements include the Camping Enforcement Jurisdiction Criteria, the Drug Enforcement Jurisdiction Criteria, the Squatting Enforcement Jurisdiction Criteria, and the Immigration Enforcement Jurisdiction Criteria. *Id.* at 22-23.

Second is the "merit review" step. *Id.* at 23-32. For this step, applicants must indicate—with a "yes" or "no" answer—whether they satisfy so-called "merit criteria." *Id.* at 22. The criteria at the "merit review" step include multiple requirements—both Jurisdiction Criteria and Applicant Criteria—that advance the Administration's ideological goals at the expense of the purposes of the program Congress created. In particular, the "merit" criteria include Camping Enforcement Jurisdiction Criteria, the Drug Enforcement Jurisdiction Criteria, the Immigration Enforcement Jurisdiction Criteria, the Involuntary Commitment Jurisdiction Criteria, and the SORNA Jurisdiction Criteria, as well as the Safe Drug Use Criteria and Sex Binary Criteria. *Id.* at 25, 29-30.

Third, HUD conducts a "risk review," ostensibly to evaluate each applicant's likelihood of successfully implementing an award. *Id.* at 32. The "risk review" looks at standard factors like the applicant's financial stability, history of performance, audit findings, and staffing structure. *Id.* at 32. But the September 5 NOFO's "risk review" criteria also look to the "[e]xistence of evidence" that the applicant meets the Safe Drug Use Criteria and Sex Binary Criteria. *Id.* at 32-33.

The NOFO states that HUD will make awards to the first eight or so applicants who meet the "threshold" criteria and answer "yes" to all the "merit" criteria, in the order of submission timestamp, until the full $75 million is awarded. *Id.* at 6, 33-34. It does not state how HUD intends to apply the "risk review" criteria. The NOFO states that HUD will make awards and obligate the funds "by September 15, 2025." *Id.* at 46.

HUD did not undertake notice and comment in adopting this process or the New Criteria. The practical effect of the New Criteria and HUD's selection process is that applicants will not receive funding, or even have a chance to compete for it, if they operate in states or local jurisdictions with policies the Administration disfavors or if they themselves engage in activities or express viewpoints that the Administration dislikes.

### E.  The New Criteria's Impact on Plaintiffs

Plaintiff National Alliance to End Homelessness (Alliance) is a nonprofit, nonpartisan membership organization that works to end homelessness in the United States. Ann Marie Oliva Declaration ¶4 (attached as Ex. A). The Alliance has substantial expertise in the factors driving homelessness as well as evidence-based and emerging best practices that end people's homelessness. *Id*. The Alliance seeks to ensure that no American is homeless by mobilizing all sectors of American society in an alliance to end homelessness. *Id*. Alliance members include other nonprofit organizations, service providers, practitioners, local researchers, local and state

government entities, and people experiencing or with a history of homelessness—all of which are dedicated to ending homelessness and many of which receive HUD CoC grants. Oliva Dec. ¶6. Plaintiff Women's Development Corporation (WDC) is a nonprofit headquartered in Rhode Island that develops and operates quality, affordable housing for low- and moderate-income families, people with special housing needs and seniors living in Rhode Island and surrounding states. Frank Shea Declaration ¶3 (attached as Ex. B). Plaintiff WDC is a member of the Alliance. *Id.* at ¶5; Olivia Dec. ¶29.

Several Alliance members, including Plaintiff WDC, build housing for homeless populations and would ordinarily apply for CoC Builds grants under the September 5 NOFO. Oliva Decl. ¶¶28-29; Shea Decl. ¶¶14, 17, 20. In fact, Plaintiff WDC previously applied for COC Builds funds twice previously, including under the May 2025 NOFO and learned from its Senator that HUD had selected WDC for an award, although HUD never actually made the award or entered into a grant agreement with WDC. Shea Decl. ¶¶6-8, 11. In short, Plaintiff WDC and other Alliance members would like to apply for grants under the September 5 NOFO for the COC Builds program. Shea ¶17; Oliva ¶¶28-29.

However, under that NOFO, Plaintiffs are now either ineligible to apply or, if they do apply, will not be selected because they cannot satisfy the New Criteria. To begin, the Jurisdiction Criteria automatically disqualifies Plaintiff WDC and other Alliance members whose projects are located in jurisdictions that do not meet those criteria. Shea Decl. ¶¶16-17; *infra* Section II (explaining that WDC's project is located in Rhode Island, which does not meet multiple Jurisdiction Criteria); *see also* Oliva Decl. ¶¶24-30. For similar reasons, Plaintiff WDC and other Alliance members are now effectively ineligible for funds—or unable to compete

fairly for those funds—because they do not meet the Sex Binary Merit Criterion, the Safe Drug Use Merit Criterion, or both. Shea Decl. ¶¶18-20; Oliva Oliva Decl. ¶¶31-34.

## LEGAL STANDARD

To obtain a temporary restraining order, Plaintiffs must establish (1) a likelihood of success on the merits; (2) that irreparable harm is likely without preliminary relief; (3) that the balance of equities tips in Plaintiffs' favor; and (4) that a preliminary injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Where the government is the opposing party, the final two factors merge. *Nken v. Holder,* 556 U.S. 418, 435 (2009). Irreparable injury operates on "a sliding scale" such that "the greater the likelihood [of success], the less harm must be shown." *Soscia Holdings, LLC v. Rhode Island*, 684 F. Supp. 3d 47, 49 (D.R.I. 2023) (citing *Braintree Labs., Inc. v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 36, 42–43 (1st Cir. 2010)).

## ARGUMENT

### I. The Alliance Is Likely To Succeed on the Merits.[1]

#### A. The New Criteria Violate the APA

The New Criteria are reviewable "final agency action" that violate the APA in myriad ways. 5 U.S.C. § 704. Plaintiffs are likely to succeed on their claims that the New Criteria must be set aside as "in excess of statutory, jurisdiction, authority, or limitations," "arbitrary [and] capricious," "not in accordance with law," and "contrary to constitutional right, power, privilege, or immunity." *Id.* § 706(2)(A)–(C).[2]

---

[1] The New Criteria are unlawful on many different grounds, but, given the urgency and to conserve judicial resources, this motion focuses on a subset of Plaintiffs' claims, any one of which would justify the TRO Plaintiffs seek.

[2] The multiple constitutional problems with the New Criteria provide grounds for relief both under the APA and as independent claims, as discussed in Sections I.B–I.D below.

### 1. *The New Criteria are final agency action.*

The New Criteria are final agency action reviewable under the APA, as courts considering claims similarly involving eligibility criteria for federal funding have held.[3] *See, e.g.*, *Multnomah Cnty. v. Azar*, 340 F. Supp. 3d 1046, 1056-59 (D. Or. 2018) (collecting cases). For agency action to be "final," it must (1) "mark the consummation of the agency's decisionmaking process" and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up).

The New Criteria mark the consummation of Defendants' decisionmaking process. Defendants have made a final decision to impose these criteria for selecting the recipients of CoC Builds grants, as reflected by the fact that they appear in the published NOFO. While Defendants could revoke this NOFO and issue a new one, "[t]he mere possibility that an agency might reconsider … does not suffice to make an otherwise final agency action nonfinal." *Sackett v. EPA*, 566 U.S. 120, 127 (2012); *see also Gen. Elec. Co. v. EPA*, 290 F.3d 377, 380 (D.C. Cir. 2002) (no action "would ever be final" if the possibility of "future revision in fact could make agency action non-final"). The New Criteria also determine rights or obligations and produce legal consequences. The threshold criteria preclude organizations from even being considered for an award if the organization does not meet them, and the "merit" criteria also effectively disqualify organizations that do not satisfy those criteria given that the first eight organizations that answer "yes" to all "merit" criteria will automatically win the awards. *See* Oliva Decl. ¶¶26-27 (listing the 36 states and additional territories from where applicants are disqualified).

---

[3] While only the "threshold" criteria are characterized as eligibility criteria, the "merit" criteria here effectively function as eligibility criteria as well because the grants will go only to the first applicants that answer "yes" to all those criteria until all the funds are exhausted. Compl. Ex. A (NOFO) at 33-34.

## 2. The New Criteria exceed Defendants' statutory authority.

The New Criteria exceed Defendants' statutory authority. For agencies charged with administering statutes, "[b]oth their power to act and how they are to act is authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). An agency "literally has no power to act ... unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). And "if an agency acts without statutory authority, then a court must set that action aside" under the APA. *Drs. for Am. v. OPM*, No. 25-cv-322, 2025 WL 1836009, at *17 (D.D.C. July 3, 2025).

No statute authorizes Defendants to withhold CoC Builds funding from projects in states and localities that do not implement the Administration's policy agenda or to deny funding to applicants based on activities they engage in or viewpoints they express outside the scope of the funded program. While the law appropriating funding for these grants provides that the funds should be awarded "based on need and other factors to be determined by the Secretary," that cannot be read as giving the Secretary unbounded discretion to award funds based on any factors he chooses, including those unrelated to the statutory purpose or orderly grants administration. *See* Pub. L. No. 117-328, div. L, tit. II, 136 Stat. 4459, 5160 (2022). Indeed, such a reading would raise serious constitutional questions under the nondelegation doctrine and must be avoided for that reason alone. *See Mistretta v. United States*, 488 U.S. 361, 373 n.7 (1989) (explaining that a statute violates the nondelegation doctrine if it "fail[s] to articulate any policy or standard that would serve to confine the discretion of the authorities to whom Congress had delegated power")

Even apart from the constitutional problem, the statute on its own does not support that broad reading. It is well established that words cannot be read "in a vacuum" and that to determine "the scope of delegated authority," courts must look "to the text in context and in light

17

of the statutory purpose." *Gundy v. United States*, 588 U.S. 128, 141 (2019) (cleaned up). Context cabins HUD's authority. The appropriations law provides funding for awards "under the Continuum of Care program." Pub. L. No. 117-328, 136 Stat. at 5160. And a detailed statutory scheme governs HUD's administration of that program—including by specifying "required" selection criteria and conditions grantees must accept. 42 U.S.C. § 11381-11389. For instance, HUD must look at the applicant's track record in reducing the length of homelessness and helping homeless individuals get jobs and "other accomplishments … related to reducing homelessness." *Id.* § 11386a(b)(1)(A). And applicants must agree, for example, to involve individuals experiencing homelessness in project operations where practicable and to certify that children in family programs are enrolled in school. *Id.* § 11386(b). The grant of authority to the Secretary to adopt additional criteria cannot be read to authorize criteria that are not "of the same kind" as these. *See King Cnty.*, 2025 WL 1582368, at *15 (interpreting similar grant of authority in CoC statute). And "[s]ubstantive conditions implicating controversial policy matters that are unrelated to the authorizing statute"—like promoting a "sex binary" view and facilitating immigration enforcement—"are simply not 'of the same kind' as" those in the statute. *Id.* Even conditions with some tie to homelessness are not authorized, because they find no footing in Congress's policy goals in enacting the statute—none of which involve blackballing jurisdictions based on their local homelessness policies or treating unhoused individuals as criminals.

### 3. The New Criteria are arbitrary and capricious

The New Criteria are also arbitrary and capricious. Under arbitrary and capricious review, courts must hold unlawful any agency action that is "not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). To pass muster, an agency must offer "'a satisfactory explanation for its action'" and can neither "rel[y] on factors which Congress has not intended it to consider" nor

ignore "an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). While agencies are free to change their existing policies, they must "display awareness that" they are doing so, provide "good reasons for the new policy," and demonstrate that they have taken account of "reliance interests" engendered by the prior policy. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). In assessing the reasonableness of an agency's explanation for its action, "the Court must look to 'the grounds that the agency invoked when it took the action.'" *New York v. Kennedy*, 2025 WL 1803260, at *14 (quoting *Michigan v. EPA*, 576 U.S. 743, 758, (2015)). The New Criteria fail on multiple fronts.

Defendants' imposition of the New Criteria fails the most basic requirement of agency decision-making: the Criteria "have not been explained at all," as another district court considering conditions that HUD imposed on other CoC grants recently held. *King Cnty.*, 2025 WL 1582368, at *17. Defendants provided no explanation for their actions, much less "a satisfactory explanation for [their] action, including a rational connection between the facts found and the choice made." *Ohio*, 603 U.S. at 292 (cleaned up).

Defendants also failed to "display awareness" that the New Criteria are a change in policy and to "show that there are good reasons for the new policy." *Fox Television Stations*, 556 U.S. at 515. While the NOFO notes that the criteria are "in compliance with" the Unhoused People Order, "the fact that an agency's actions were undertaken to fulfill a presidential directive does not exempt them from arbitrary-and-capricious review." *Kingdom v. Trump*, No. 25-cv-691, 2025 WL 1568238, at *10 (D.D.C. June 3, 2025); *accord, e.g.*, *R.I. Coal. Against Domestic Violence v. Bondi*, No. 25-279, 2025 WL 2271867, at *8 (D.R.I. Aug. 8, 2025) (holding that agency cannot "avert the 'arbitrary and capricious' analysis by simply deferring to the relevant

Executive Order" (cleaned up)); *King Cnty.*, 2025 WL 1582368, at *17 (holding that "rote incorporation of executive orders … does not constitute 'reasoned decisionmaking'"); *Louisiana v. Biden*, 622 F. Supp. 3d 267, 295 (W.D. La. 2022) ("A decision supported by no reasoning whatsoever in the record cannot be saved merely because it involves an Executive Order.").

Defendants also failed to consider a host of important aspects of the problem. There is no indication that Defendants considered best practices in homelessness policy or any evidence of what strategies are successful. *See, e.g.*, Oliva Decl. ¶ 20 (stating "that the NOFO criteria disadvantages organizations that have the most experience to take on this type of project"). Nor does the agency appear to have considered the detrimental impact of the New Criteria on the communities served by grantees, any alternative more limited policy change, or grantees' reasonable reliance on the opportunity to compete for the funds or the reliance interests of communities served by grantees. *See, e.g.*, Shea Decl. ¶¶ 8-11 (describing extensive reliance interests); *see also* ¶23 (describing harm to communities served by grantees). It likewise does not appear to have considered the impact of imposing new conditions that are so vaguely worded that they do not give grantees adequate notice of how to determine whether they meet them (how, for example is an applicant to know whether its local jurisdiction enforces a ban on urban camping or "loitering" at a level HUD will deem sufficient?)—or the possibility that the resulting confusion would deter grantees from applying for fear of making a false statement. *See, e.g.*, Oliva Decl. ¶¶19-20.

Defendants also failed to recognize that the Sex Binary Criterion conflicts with binding statutory and regulatory requirements, or to attempt to reconcile those conflicts. In particular, the Fair Housing Act and Title VII prohibit discrimination in housing and employment, respectively, on the basis of sex, including gender identity. 42 U.S.C. §§ 3604(a)-(b), 2000e–2(a)(1); *see also*

*Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020) (interpreting Title VII to prohibit discrimination based on gender identity); *see also Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519 (2015) (likening Fair Housing Act's sex discrimination provisions to those of Title VII). And binding HUD regulations require that, in CoC programs, individuals be treated in accordance with their gender identity. 24 C.F.R. § 5.106. It is unclear—and Defendants did not consider or explain—how a grantee could comply with these mandates while at the same time meeting the requirement to deny transgender people's identity as the Sex Binary Criterion requires.[4]

### 4.   *HUD failed to follow required procedure in imposing the New Criteria.*

The New Criteria also must be set aside under the APA because they are 'without observance of procedure required by law," 5 U.S.C. § 706(2)(D). The HUD Reform Act requires HUD to publish the criteria for selecting awardees at least 30 days before the deadline to apply. 42 U.S.C. § 3545(a)(3). Defendants published the criteria only 7 days before the deadline. While the statute permits the HUD Secretary to waive this requirement if he determines it "is required for appropriate response to an emergency," *id.* § 3545(a)(5), no emergency existed here. The funds are set to expire in less than 30 days, but that is an emergency entirely of HUD's own making. *See supra* Background Section D. And such self-inflicted emergencies cannot justify circumventing the statutorily mandated notice period or else the agency could regularly avoid that obligation. *See Make the Rd. N.Y. v. Pompeo*, 475 F. Supp. 3d 232, 262, 263 (S.D.N.Y. 2020) (holding that agency could not "evade the notice-and-comment rulemaking process mandated under the APA" by pointing to "a self-inflicted, artificial emergency" because that would mean agencies "could simply wait until the eve of a statutory, judicial, or administrative

---

[4] For this reason, the Sex Binary Criterion is also contrary to law and must be set aside on that basis.

deadline, then raise up the 'good cause' banner and promulgate rules without following APA procedures" (cleaned up)).

**B. The New Criteria Violate Multiple Constitutional Provisions Safeguarding the Separation of Powers**

The New Criteria also violate the Spending Clause and other constitutional provisions safeguarding the separation of powers. As court after court has recognized, imposing "extra-statutory conditions on federal grant awards as a tool to obtain compliance with [the executive's] policy objectives strikes at the heart of … the separation of powers." *City of Chi. v. Barr*, 961 F.3d 882, 892 (7th Cir. 2020) (holding that the executive branch violated separation of powers by conditioning federal funding on recipients' facilitating immigration enforcement); *see also, e.g.*, *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1231, 1234–35 (9th Cir. 2018) ("withhold[ing] all federal grants from so-called 'sanctuary' cities and counties" violated separation of powers); *King Cnty.*, 2025 WL 1582368, at *6, 15–17 ("gender ideology" and anti-DEI funding conditions violated separation of powers); *PFLAG, Inc. v. Trump*, No. 25-cv-337, 769 F. Supp. 3d 405, 431–43 (D. Md. 2025) (conditioning funding on recipients' denying gender-affirming care violated separation of powers); *Washington v. Trump*, 768 F. Supp. 3d 1239, 1261–63 (W.D. Wash. 2025) ("gender ideology" funding conditions violated separation of powers).

Defendants have done precisely that here. As explained above, *supra* section I.A.2, Congress has not authorized Defendants to impose the New Criteria. In doing so anyway, Defendants have exceeded their constitutional authority and encroached on Congress's power to control federal spending, in violation of foundational separation-of-powers principles under the Appropriations Clause, Spending Clause, legislative vesting clause, bicameralism and presentment clause, and Take Care Clause. U.S. Const., art. I, § 1; § 7, cl. 2; § 8, cl. 1; § 9, cl. 7; art. II, § 3.

At bottom, the Founders established our system of separated powers to guard against "a concentration of power [that] would allow tyranny to flourish." *City of Chi.*, 961 F.3d at 892. In that system, "the power to wield the purse to alter behavior rests squarely with the legislative branch"—whose "elected representatives and dual chambers … provide[] institutional protection from the abuse of such power." *Id.* That "institutional protection from abuse" would disappear if the executive branch could "impose [its] policy preferences regardless of the will of Congress." *Id.* Defendants' attempt to leverage federal funding "to effectuate [the executive's] own policy goals" thus violates the separation of powers. *See City & Cnty. of S.F.*, 897 F.3d at 1235.

### C. The Jurisdiction Criteria Violate the Tenth Amendment

The Jurisdiction Criteria also violate the Tenth Amendment. The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend X. Legislation that "coerces a State to adopt a federal regulatory system as its own" "runs contrary to our system of federalism." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577–78 (2012).

The Jurisdiction Criteria violate the Tenth Amendment by imposing criteria that coerce states and localities to adopt the Administration's agenda as their own. The Jurisdiction Criteria do not just exclude the jurisdictions themselves from consideration—and allow the jurisdictions to determine whether to take the funds subject to the criteria or leave them—but exclude organizations operating within those jurisdictions from consideration as well. *See, e.g.*, Oliva Decl. ¶¶26-29; Shae Decl. ¶¶ 13, 17. This blacklisting of organizations based in the targeted jurisdictions is different in kind—and works greater coercion—than merely imposing conditions on the jurisdictions themselves would. The Jurisdiction Criteria thus threaten to improperly

commandeer state and local officials into adopting and implementing the Administration's favored policies.

### D. The Sex Binary Criterion Violates the First Amendment

The Sex Binary Criterion violates the First Amendment's protection of "the freedom of speech," U.S. Const. amend. I, by disqualifying applicants who do not commit to "deny[ing] the sex binary in humans" and "promot[ing] the notion that sex is a chosen or mutable characteristic," Compl. Ex. A (NOFO) at 30, 32. This straightforwardly disadvantages applicants based on the viewpoint they express: If they express the view that sex is mutable and nonbinary, they cannot get a grant. This violates the First Amendment.

While the government may, in some circumstances, attach conditions to federal funding that "affect the recipient's exercise of its First Amendment rights," there are limits. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013). Crucially, the government may not restrict "protected [speech] outside the scope of the federally funded program." *Id.* at 217 (citing *Rust v. Sullivan*, 500 U.S. 173, 197 (1991)). Nor may it leverage government funding to "aim at the suppression of dangerous ideas." *NEA v. Finley*, 524 U.S. 569, 587 (1998) (cleaned up). And imposing a funding condition "not relevant to the objectives of the program" can also violate the First Amendment. *Agency for Int'l Dev.*, 570 U.S. at 214.

The Sex Binary Criterion transgresses those limits. To begin, the Criterion impermissibly restricts speech "outside the scope of the federally funded program," *id.* at 217. Applicants must attest that they will not "promote" the government's disfavored view, or "deny" its favored one, period—whether they are using federal funds or not. The Sex Binary Criterion thus imposes a viewpoint-based bar on applicants who express a viewpoint that the Administration disfavors. This curtails applicants' speech outside the scope of the federally funded program and punishes applicants based on that speech.

Beyond that, the criterion is "entirely untethered to any 'legitimate objective[s]'" of the programs it burdens. *S.F. AIDS Found. v. Trump*, No. 25-cv-1824, 2025 WL 1621636, at *16 (N.D. Cal. June 9, 2025). Instead, it is "directed … towards disfavored speech." *Id.* at *17. This impermissible "withholding [of] subsidies for a censorious purpose—aiming to suppress" what the government views as a "dangerous idea[]"—violates the First Amendment. *Id.* at *18; *see also R.I. Latino Arts v. NEA*, No. 25-cv-79, 777 F. Supp. 3d 87, 109-110 (D.R.I. Apr. 3, 2025) (noting that government cannot "use subsidies to suppress 'dangerous ideas'" and concluding that bar on funding art programs that "promote gender ideology" was "a clear First Amendment violation").

## II. Plaintiffs Will Suffer Irreparable Injury Absent Emergency Relief.

A plaintiff suffers "irreparable harm" when its injuries "cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). Plaintiffs will suffer such harm absent emergency relief in two ways.

*First*, the New Criteria will irreparably deprive the Alliance's members, including WDC, of the ability to compete for CoC Build funds. Oliva Decl. ¶¶28-29; Shea Decl. ¶¶14-20. Courts have long recognized that "a plaintiff suffers a constitutionally cognizable injury by the loss of an opportunity to pursue a benefit . . . even though the plaintiff may not be able to show that it was certain to receive that benefit had it been accorded the lost opportunity." *Teton Historic Aviation Found. v. DOD* , 785 F.3d 719, 724 (D.C. Cir. 2015) (quoting *CC Distribs., Inc. v. United States*, 883 F.2d 146, 150 (D.C. Cir. 1989); *Ecosystem Inv. Partners v. Crosby Dredging, LLC*, 729 F. App'x 287, 292 (5th Cir. 2018) (same); *Nat'l Ass'n of Consumer Advocs. v. Uejio*, 521 F. Supp. 3d 130, 145 (D. Mass. 2021) (same).

Here, both the Jurisdiction and Applicant Criteria deprive the Alliance's members of the ability to compete for the CoC Build funds. With respect to the former, the Jurisdiction Criteria render Plaintiffs ineligible for reasons entirely outside of their control. *See* Shea Decl. ¶13. Namely, a project is automatically disqualified from receiving funds if it is located in a jurisdiction that has adopted policies that the administration does not like—on issues that range from immigration to drug use. *Supra* at Background Section D. For example, under the Immigration Enforcement Jurisdiction Criteria, a project is ineligible if it is located in a jurisdiction that HUD believes does not cooperate with federal immigration enforcement. Compl. Ex. A (NOFO) at 23, 30. Such jurisdictions likely include those listed on the Department of Justice's recently published List of Sanctuary Jurisdictions that—in the Department's view— have "policies . . . that impede enforcement of federal immigration laws."[5] Likewise, a project will be ineligible if it is located in a jurisdiction that HUD believes does not implement and comply with SORNA. Compl. Ex. A (NOFO) at 30. Here too, the Department of Justice has published a list of jurisdictions that the Department has determined do not "substantially implement[] SORNA."[6] These Immigration Enforcement and SORNA Jurisdiction Criteria thus deprive WDC and other Alliance members of the opportunity to fairly compete for the CoC Build funds where their proposed projects are located in the listed jurisdictions, as Rhode Island is (among many others). Other Jurisdiction Criteria have similar effects. *See* Oliva Decl. ¶¶26-27 (naming 40 states and territories "now unable to compete fairly under the New Criteria.").

---

[5] Dep't of Justice, *Justice Department Publishes List of Sanctuary Jurisdictions* (Aug. 5, 2025), https://www.justice.gov/opa/pr/justice-department-publishes-list-of-sanctuary-jurisdictions.
[6] Dep't of Justice, *SORNA Implementation Status* (last visited Sep. 10, 2025), https://smart.ojp.gov/sorna/sorna-implementation-status.

For example, WDC previously applied under the May 2025 NOFO for CoC Build funds to construct a project located in Providence, Rhode Island and would like to apply again under the September 5 NOFO. Shea Decl. ¶14. However, as a direct result of the New Criteria, WDC's project is now ineligible for the CoC Builds funding because the project is located in Rhode Island—a jurisdiction that HUD will conclude meets neither the SORNA nor the Immigration Enforcement Jurisdiction Criteria, and possibly others.[7] *Id*. at ¶17.

For similar reasons, the unlawful Applicant Criteria deprive Plaintiffs of the ability to fairly compete for CoC Build funds. WDC and other Alliance members who would like to apply for the funds are now effectively ineligible, or unable to compete fairly, because they cannot meet either the Sex Binary Merit Criterion, the Safe Drug Use Merit Criterion, or both. *Supra* at Background Section E.  For example, WDC is effectively ineligible because "WDC recognizes and provides culturally appropriate services to transgender and non-binary people according to their gender identity." Oliva Decl. ¶33; *accord* Shea Decl. ¶20 (stating that WDC cannot meet the Sex Binary Criterion, because it "do[es] not take gender or sex in consideration in hiring or providing services").

Moreover, these injuries—*i.e.*, the lost opportunities to compete—will fast become irreparable absent relief. As noted, the NOFO was published on September 5, applications are due on September 12, funds will be awarded to the first eight or so applicants who answer "yes" to the Merits Criteria until funds are exhausted, and HUD has stated that it will obligate all funds by September 15. *Supra* Background Section D. In other words, the application process will conclude tomorrow, and the funds will be obligated to other recipients imminently, thus

---

[7] List of Sanctuary Jurisdictions, *supra* note 5 (listing Rhode Island); SORNA Implementation Status, *supra* note 6 (same).

threatening to permanently deprive WDC and other Alliance members of the opportunity to compete for the CoC Build funds. At the latest, absent relief, Plaintiffs will irretrievably lose their opportunity to compete when the funding expires on September 30. *See, e.g.*, Shea Decl. ¶¶21-22; Oliva Decl. ¶¶35-36.

Other courts have recognized irreparable harm in analogous circumstances where grant funds would become unavailable absent preliminary relief. As the D.C. Circuit has explained, "[f]unds appropriated for an agency's use … become unavailable" if "the appropriation lapses" or "if the funds have already been awarded to other recipients." *City of Houston v. Dep't of Hous. & Urb. Dev.*, 24 F.3d 1421, 1426–27 (D.C. Cir. 1994). In those circumstances, "a court cannot reach them in order to award relief." *Id.* at 318. So too here, the Court must be able to reach the funds to ensure there is something for WDC and Plaintiffs' members to compete for (and to avoid having the program as a whole go unfunded when the appropriation lapses). The Court thus must preserve the funds before they are obligated (or at least before they are disbursed) and before the appropriation lapses.[8] *See also, e.g.*, *Ambach v. Bell*, 686 F.2d 974, 986 (D.C. Cir. 1982) ("Once the chapter 1 funds are distributed to the States and obligated, they cannot be recouped. It will be impossible in the absence of a preliminary injunction to award the plaintiffs the relief they request if they should eventually prevail on the merits."); *Population Inst. v. McPherson*, 797 F.2d 1062, 1081 (D.C. Cir. 1986) (noting that "if the government in the instant case is permitted to distribute the $10 million to other organizations, the appeal will become moot"). As a federal court of appeals has advised, "to avoid having its case mooted"—

---

[8] A court can effectively prevent an appropriation from lapsing because "the equity powers of the courts allow them to take action to preserve the status quo of a dispute and to protect their ability to decide a case properly before them. In such situations, the courts simply suspend the operation of a lapse provision and extend the term of already existing budget authority." *Nat'l Ass'n of Regional Councils v. Costle*, 564 F.2d 583, 588 (D.C. Cir. 1977).

and irretrievably suffering the relevant harm—a plaintiff challenging an agency's use of federal funds "must both file its suit before the relevant appropriation lapses *and* seek a preliminary injunction preventing the agency from disbursing those funds." *City of Houston*, 24 F.3d at 1427. In other words, to ever have an opportunity to compete for the funds under a fair application process unencumbered by the New Criteria, this Court must act now to preserve the funds.

Second, Plaintiffs are also irreparably injured by the Sex Binary Criterion, which punishes applicants for engaging in certain disfavored speech, in violation of their First Amendment rights. *Supra* Section I.D. This criterion causes immediate constitutional harms, including censoring speech based on viewpoint. As the First Circuit has repeatedly recognized, "irreparable injury is presumed upon a determination that the movants are likely to prevail on their First Amendment claim." *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 11 (1st Cir. 2012); *Hannon v. Allen*, 241 F. Supp. 2d 71, 78 (D. Mass. 2003) ("Even the temporary loss of a constitutional right may be a form of irreparable harm.").

### III. The Balance of the Equities and Public Interest Favor a TRO.

The balance of the equities and public interest favor immediately enjoining Defendants from committing federal funds using a rushed process and unauthorized and unconstitutional criteria. The final two temporary restraining order factors—balancing the equities and weighing the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, Plaintiffs' strong likelihood of success on the merits, *see supra* Argument section I, itself establishes that the equities and public interest favor preliminary relief. "It is well established that the Government cannot suffer harm from an injunction that merely ends an unlawful practice." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (cleaned up). Rather, there is "substantial public interest 'in having governmental agencies abide by the

federal laws.'" *Massachusetts v. Nat'l Institutes of Health*, 770 F. Supp. 3d 277, 326 (D. Mass. 2025), *judgment entered,* No. 1:25-CV-10338, 2025 WL 1063760 (D. Mass. Apr. 4, 2025). Therefore, the injunction would serve the public interest as HUD is forced to abide by existing law and regulations.

Conversely, Defendants are unlikely to meet the hardship or public interest factors given that they preemptively, and without warning, issued a new NOFO with unlawful criteria providing grantees a one-week turnaround. Even assuming that Defendants have an interest in changing the program goals for CoC Builds grants, the scale remains tipped in Plaintiffs' favor because the government "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013); *see also R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (finding that the government "cannot suffer harm from an injunction that merely ends an unlawful practice"). Further, there is no public interest in upholding unlawful agency action. *See Massachusetts*, 770 F. Supp. 3d at 326–27.

Absent relief, the applicants will lose the chance to compete fairly for critical funds that Congress intended to be used to address homelessness in the United States. And those funds are at risk of being allocated in a manner that Congress did not authorize or being lost altogether following their expiration absent court intervention. The resulting irreparable injuries would be both to Plaintiffs and their members, and to the vulnerable populations they serve. *See, e.g.*, Oliva Decl. ¶¶35-37; Shea Decl. ¶23.

Thus, the balance of the equities and the public interest is clear. On the one hand, "the government cannot suffer harm from an injunction that merely ends an unlawful practice." *Massachusetts*, 770 F. Supp. 3d at 326 (cleaned up). On the other hand, allowing HUD to implement these new criteria would violate Congress's wishes, our separation of powers, and the

separate sovereignty of states and localities—and reverberate to vulnerable unhoused people across the country. Particularly here, where so much is at stake, the government should not be permitted to "leverag[e] the needs of our most vulnerable fellow humans" by conditioning federal funds "to compel Plaintiffs' compliance with unrelated policy objectives." *Martin Luther King, Jr. Cnty. v. Turner*, No. 2:25-CV-814, 2025 WL 1582368, at \*19 (W.D. Wash. June 3, 2025). Such actions would be "breathtaking in its callousness." *Id.*

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for a temporary restraining order.

September 11, 2025                              Respectfully submitted,

                                               */s/ Amy R. Romero*
                                               Amy R. Romero (RI Bar # 8262)
                                               Kevin Love Hubbard (MA Bar #704772)^
                                               DeLuca, Weizenbaum, Barry & Revens, Ltd.
                                               199 North Main Street
                                               Providence, RI 02903
                                               (401) 453-1500
                                               Amy@dwbrlaw.com
                                               Kevin@dwbrlaw.com
                                               Cooperating counsel, Lawyers' Committee for RI

                                               */s/ Kristin Bateman*
                                               Kristin Bateman (Cal. Bar No. 270913)^+ ^
                                               Yenisey Rodriguez (D.C Bar No. 1600574)^
                                               Kristen Miller (D.C. Bar No. 229627)^
                                               Robin F. Thurston (D.C. Bar No. 1531399)^
                                               Democracy Forward Foundation
                                               P.O. Box 34553
                                               Washington, D.C. 20043
                                               (202) 448-9090
                                               kbateman@democracyforward.org
                                               yenisey.rodriguez@democracyforward.org
                                               consultantkmiller@democracyforward.org
                                               rthurston@democracyforward.org

                                               */s/ Antonia K. Fasanelli*

Antonia K. Fasanelli (DC Bar No. 481856)[^]
National Homelessness Law Center
1400 16th Street, NW, Suite 425
Washington, DC  20036
(202) 638-2535
afasanelli@homelesslaw.org

*/s/ Lynette Labinger*
Lynette Labinger (RI Bar No. 1645)
128 Dorrance St., Box 710
Providence, RI 02903
(401) 465-9565
ll@labingerlaw.com
Cooperating counsel, ACLU Foundation of RI

*Counsel for Plaintiffs*

[^] *Pro hac vice* motion forthcoming
[+] Not admitted in the District of Columbia. Practice supervised by members of the D.C. bar