# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| NATIONAL ALLIANCE TO END HOMELESSNESS<br>1025 Vermont Avenue NW<br>Suite 1200<br>Washington, DC 20005, *and*<br><br>WOMEN'S DEVELOPMENT CORP.<br>861 A Broad Street<br>Providence, RI 02907,<br><br>        *Plaintiffs*,<br><br>v.<br><br>SCOTT TURNER, in his official capacity as Secretary of the United States Department of Housing and Urban Development<br>451 7th Street SW<br>Washington, DC 20410, and<br><br>UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT,<br>451 7th Street SW<br>Washington, DC 20410,<br><br>        *Defendants*. | Case No. 25-447 |

## DECLARATION OF ANN MARIE OLIVA

I, Ann Marie Oliva, declare the following under penalties of perjury:

    1.     My name is Ann Marie Oliva.

    2.     I am the Chief Executive Officer of the National Alliance to End

Homelessness (the "Alliance"). I have dedicated my career to educating the public on the

nature of homelessness and its solutions, and to advance known best practices within the homeless services sector.

3.    I have personal knowledge of the facts contained in this declaration. If called upon to testify, I could and would testify competently as to the truth of the facts in this declaration.

**The Alliance's Mission and Structure**

4.    The Alliance is a nonprofit, nonpartisan membership organization that works to end homelessness in the United States. The Alliance has substantial expertise in the factors driving homelessness as well as evidence-based and emerging best practices that end people's homelessness. The Alliance seeks to ensure that no American is homeless by mobilizing all sectors of American society in an alliance to end homelessness.

5.    Attached as Exhibit A is a true and correct copy of the Alliance's bylaws.

6.    Our members include nonprofit organizations, people with lived experiences of homelessness, service providers, practitioners, local researchers, and local and state government entities dedicated to ending homelessness.

7.    Among other things, the Alliance serves its members by (1) providing members with research and analysis on solutions to end homelessness; (2) offering intensive, on-the-ground technical assistance tailored to its members' local needs; and (3) convening members across the country—through annual conferences and other fora—to share best practices regarding how to end homelessness.

8.    The Alliance also offers its members specific services regarding the Department of Housing and Urban Development (HUD) Continuum of Care (CoC) grant program, including analysis and trainings on HUD's priorities in the grant program. Such

services facilitate the ability of Alliance members to compete for and comply with grants issued under the program.

9.      The Alliance's members play a significant role in the organization in at least three ways.

10.     First, Alliance members guide the Alliance's agenda and activities through various means. They sit on a series of formal councils and advisory bodies that advise the Alliance on its various workstreams, including our Leadership Council, Research Council, Community Strategic Team (Lived Experience Advisors Council), and Capacity Building Network. To take just one example, the Capacity Building Network is an advisory body comprised of Alliance members who serve for two-year terms. That group advises the Alliance's Center for Capacity Building in the development of technical assistance, training, and resources—services that the Alliance provides to its members and communities around the country to help them implement data-driven and equitable systemic responses to homelessness.

11.     Members also help guide the Alliance's activities by shaping the content and agenda of the Alliance's annual conferences. The Annual conferences are the central forum in which Alliance members convene on an annual basis to share best practices and lessons learned from their communities, drive innovations, and build lasting solutions for ending homelessness. Alliance members help shape those conversations by responding to calls for presentations with proposed talks and panels and by filling out robust surveys at the end of conferences that inform future conferences.

12.     Second, Alliance members provide crucial financial support that facilitates Alliance activities. Members pay registration fees that provide up to 85 percent of the funds

necessary to run the annual conferences, and some members provide direct donations that fund the Alliance's broader activities.

13.    Finally, Alliance members comprise roughly a quarter of the Alliance's Board of Directors. In that capacity, Alliance members play a direct role in leading the organization, setting priorities, and in selecting Alliance leadership, including future board members and the Alliance's officers.

**HUD Issues a New NOFO for CoC Builds Grants Despite Having Previously Solicited and Received Eligible and Meritorious Applications**

14.    HUD previously solicited applications for grants funded by Congress's 2023/2024 appropriations for construction, acquisition, or rehabilitation of permanent supportive housing—named "CoC Builds" grants—two times but did not publicly announce awards either time.

15.    In July 2024, HUD published a notice of funding opportunity (NOFO) for the "CoC Builds" grants with an application deadline of December 5, 2024. I understand that, although HUD received and reviewed applications, it did not complete the process of making awards before the Administration changed on January 20, 2025. The new Administration did not make awards from the existing application pool.

16.    On May 16, 2025, HUD published a new NOFO to solicit applications for the CoC Builds grants with an application deadline of June 26, 2025.

17.    HUD received and reviewed applications in response to the May 2025 NOFO, selected recipients, and even notified Congress of whom the agency had selected for grant awards. Some members of Congress even issued their own press on the awards, informing constituents on who won. Yet, without explanation, the agency never directly notified the awardees or executed any grant agreements. At least some of the applicants

selected as recipients of CoC Builds funds under the May 2025 NOFO learned about their awards via announcements made by their congressional offices.

18.    On September 5, 2025, HUD issued a third NOFO without any advance warning. This NOFO not only included significant changes, but also imposed a one-week turnaround, specifically September 12, 2025.

19.    As a former HUD leader who administered the CoC Program competition for 10 years, I know firsthand the tremendous amount of work a competition of this nature entails for applicants. The one-week competition period included in the most recent CoC Builds NOFO is far outside of the normal standard and is less than the minimum standard (which is 30 days) required under the HUD Reform Act for funding competitions administered by HUD. Even if the scoring criteria and other details were similar to the previous two iterations of this NOFO, it would be a challenge for many applicants. However, this NOFO includes a wholly different eligible population and rating factors. It is ludicrous to think that an applicant can put together a high-quality project designed to meet the needs of a new population of people experiencing homelessness, including a comprehensive program design, identification of key partners, and site location and specifications to inform a budget that includes other funding sources – in one week.

20.    In addition, from our work fielding inquiries from our members, we have learned that: many potential applicants don't feel like they can meet the criteria established in the NOFO; understanding HUD's goals for this funding is challenging because even key terms used in the NOFO are undefined; one week is not enough time to develop high-quality projects and get required approvals from government officials or other required approvers; the application period does not allow for enough time to secure adequate

funding to match the level of supportive services required; some applicants feel like their time has been wasted by HUD given the previous two application rounds; that the NOFO criteria disadvantages organizations that have the most experience to take on this type of project; and that many applicants from previous rounds will not apply again.

**HUD Imposes New Eligibility and Selection Criteria that Deprive Alliance Members of a Fair Opportunity to Compete for CoC Builds Funding**

21.    The September 5, 2025 Notice of Funding Opportunity (NOFO) for the Continuum of Care (CoC) Builds grant program has injured the Alliance and its members by adopting new, unlawful criteria.

22.    With respect to Alliance members, the new criteria deprive Alliance members of a fair opportunity to compete for the CoC Builds grant funds. The new criteria that render many Alliance members ineligible for funding fall in two categories.

23.    *First*, the September 5 NOFO establishes Jurisdictional Criteria that render many Alliance members ineligible for reasons entirely outside of the members' control. Namely, the NOFO provides that grant applicants are ineligible for funding if the proposed project is located in a jurisdiction that has adopted—or failed to adopt—certain policies. Specifically, a project is eligible for funding only if it is located in a jurisdiction that:

    a.  Prohibits open illicit drug use and enforces that prohibition (Drug Enforcement Jurisdiction Criterion);

    b.  Prohibits urban camping or loitering and enforces that prohibition (Camping Enforcement Jurisdiction Criterion);

    c.  Prohibits urban squatting and enforces that prohibition (Squatting Enforcement Jurisdiction Criterion);

6

    d.   Cooperates with federal immigration enforcement (Immigration Enforcement Jurisdiction Criterion);

    e.   "Utilizes standards that address individuals who are a danger to themselves or others" (Involuntary Commitment Jurisdiction Criterion); and

    f.   "Substantially implements and complies with SORNA, particularly in the case of registered sex offenders with no fixed address, including by adequately mapping and checking the location of homeless sex offenders" (SORNA Jurisdiction Criterion).

24.    Many Alliance members would apply for the CoC Builds grants under the September 5 NOFO if they were eligible, but are unable to do so—or are unable to have a fair opportunity to compete—because of the Jurisdictional Criteria.

25.    Alliance members are ineligible if their proposed projects are located in any state that HUD would deem to fail to meet the Jurisdiction Criteria. While the vagueness of the criteria make it difficult to identify every jurisdiction that is excluded, the Department of Justice has compiled a list of "sanctuary jurisdictions" (which the Department has concluded are not cooperating with the federal government on immigration enforcement), as well as a list of jurisdictions that have not substantially implemented SORNA.

26.    Based on those lists alone, Alliance members are ineligible or unable to have a fair opportunity to compete if their proposed projects are located in the following 36 states, all of which fail to meet one or more of the Jurisdictional Criteria mentioned above:

    a.   Alaska

b.  Arizona

c.  Arkansas

d.  California

e.  Colorado

f.  Connecticut

g.  Delaware

h.  Georgia

i.  Hawaii

j.  Idaho

k.  Illinois

l.  Indiana

m.  Iowa

n.  Kansas

o.  Kentucky

p.  Maine

q.  Massachusetts

r.  Minnesota

s.  Montana

t.  Nebraska

u.  Nevada

v.  New Hampshire

w.  New Jersey

x.  New Mexico

y.  New York

z.  North Carolina

aa. North Dakota

bb. Oregon

cc. Pennsylvania

dd. Rhode Island

ee. Texas

ff.  Utah

gg. Vermont

hh. Washington

ii.  West Virginia; and

jj.  Wisconsin.

27.    The District of Columbia, Puerto Rico, the U.S. Virgin Islands, and the Northern Mariana Islands also fail to meet the New Jurisdictional Criteria.

28.    The Alliance has members located throughout the states listed above, many of whom would like to compete for the CoC Builds funding but are now unable to compete fairly under the New Criteria.

29.    For example, in June 2025—pursuant to the May 2025 NOFO—Alliance member the Women's Development Corporation ("WDC") applied for a CoC Builds grant to fund a project located in Rhode Island. In fact, HUD selected WDC to receive a $7 million CoC Builds award in August and notified Congress of this fact, yet never actually made the award to WDC.

30.     However, under the new September 5 NOFO, WDC is now ineligible to be considered for the CoC Builds funding because the project is located in Rhode Island—a jurisdiction that likely does not meet at least two of the Jurisdictional Criteria (i.e., the Immigration Enforcement Jurisdiction Criterion and the SORNA Jurisdiction Criterion, the only two criteria for which there is any way to determine what jurisdictions HUD will likely deem noncompliant). Although WDC would like to compete for the CoC Builds funds under the September 5 NOFO, WDC cannot do so, or cannot be fairly considered, as a direct result of the Jurisdiction Criteria.

31.     *Second*, the September 5 NOFO establishes unlawful Applicant Criteria that Alliance members are unable to meet, rendering those members ineligible for funding or unable to compete on fair and lawful terms. Because of the Applicant Criteria, members will now either forgo applying altogether or will be effectively disqualified when they submit their application. Specifically, the NOFO adopts two such unlawful criteria, which require applicants to state that:

a.  It "does not," and "will not," "operate drug injection sites or 'safe consumption sites,' knowingly distribute drug paraphernalia on or off of property under their control, permit the use or distribution of illicit drugs on property under their control, or conduct any of these activities under the pretext of 'harm reduction'" (Safe Drug Use Criterion); and

b.  It "does not and will not deny the sex binary in humans or promote the notion that sex is a chosen or mutable characteristic" (Sex Binary Criterion).

32.     Many of our members do not meet these criteria.

33.     For example, Alliance member WDC would like to apply for the funds, but is effectively ineligible because it cannot meet the Sex Binary Merit Criterion. Specifically, because WDC recognizes and provides culturally appropriate services to transgender and non-binary people according to their gender identity.

34.     Other members operate safe injection or other harm reduction sites with non-federal funds and thus do not satisfy the Safe Drug Use Criterion.

35.     Absent preliminary relief, Alliance members will be irreparably harmed because they will be irretrievably deprived of the opportunity to compete for these funds. The NOFO was published on September 5, applications are due on September 12, and HUD intends to award funds to the first eight applicants who meet the NOFO's criteria, including the Jurisdiction Criteria and Applicant Criteria described above.

36.     Absent immediate relief, that application process will conclude on Friday, September 12, and the funds will be obligated to other recipients imminently, thus permanently depriving Alliance members of the opportunity to compete for the CoC Build funds.

**HUD's Actions Also Harm the Alliance**

37.     Beyond injuries to its members, the Alliance has also suffered a direct injury in the form of an increased demand on its services, resulting in diverted resources and the loss of valuable staff time.

38.     As noted, the Alliance provides services specific to the CoC grant program, including analysis and trainings on HUD's priorities in the grant program. Such services facilitate the ability of Alliance members to compete for and comply with grants issued under the program.

39.    In addition to formal webinars and trainings, the Alliance answers requests from members for analysis on the CoC grant program priorities. These requests are received by email, phone, and through a Facebook group called the "Hub."

40.    Since the September 5 NOFO, requests from Alliance members for analysis on the CoC program—and the September 5 NOFO in particular—have skyrocketed. Indeed, nine Alliance Staff have spent no less than 169 hours collectively answering questions and requests related to the September 5 NOFO.

41.    Normally, those staff members would have spent (depending on the specific NOFO) approximately no more than 10 hours during this time frame answering such requests.

42.    This valuable staff time is being diverted away from other important work at the Alliance. This includes providing direct support to communities, conducting training on evidence-based and equitable solutions to homelessness, conducting advocacy and educational activities with state, local and national leaders, and planning for our conferences.

Executed on September 10, 2025

_____

Ann Marie Oliva
CEO of National Alliance to End Homelessness

12