# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

NATIONAL ALLIANCE TO END
HOMELESSNESS, *et al.*,

        *Plaintiffs*,

v.

SCOTT TURNER, in his official capacity as
Secretary of the United States Department of
Housing and Urban Development, *et al.*,

        *Defendants*.

Case No. 25-cv-00447

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... iii

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................... 3

    A.  The Administration leverages federal funding to advance unrelated policy goals and to punish jurisdictions with disfavored policies ....................................................... 3

        1.  Immigration ........................................................................................................ 3

        2.  "Gender Ideology" ............................................................................................ 4

        3.  Homelessness ..................................................................................................... 5

    B.  HUD creates the Continuum of Care grant program to address homelessness ................ 6

    C.  Statutes and regulations govern how HUD can administer grant funding ....................... 8

    D.  HUD issues notices of funding opportunity for CoC Builds grants in July 2024 and May 2025 ............................................................................................. 10

    E.  HUD issues a last-minute new NOFO with unprecedented new criteria and process .... 10

    F.  The September 5 NOFO harms Plaintiffs ...................................................... 14

    G.  Procedural history .................................................................................... 16

LEGAL STANDARD ......................................................................................................... 17

ARGUMENT ...................................................................................................................... 17

I.  The September 5 NOFO's New Criteria and Application Process Are Unlawful ................... 18

    A.  The September 5 NOFO's New Criteria and process must be set aside under the APA .................................................................................................. 18

        1.  The September 5 NOFO's criteria and application process are reviewable final agency action ......................................................................... 18

        2.  The New Criteria violate the APA ................................................................... 19

a.    The Jurisdiction-Based Criteria are contrary to law ............................................... 19

b.    The New Criteria exceed Defendants' statutory authority ................................... 20

c.    The New Criteria are arbitrary and capricious...................................................... 22

d.    The New Criteria are contrary to the Constitution................................................ 25

e.    The Sex Binary Criterion is contrary to law ......................................................... 25

3.    The September 5 NOFO's truncated application period violates the APA ............... 26

B.    The New Criteria violate the Constitution........................................................................ 27

1.    The New Criteria violate the separation of powers .................................................. 28

2.    The New Criteria violate the Spending Clause ......................................................... 30

3.    The Jurisdiction-Based Criteria violate the Tenth Amendment ............................... 32

4.    The Sex Binary Criterion violates the First Amendment.......................................... 34

C.    The September 5 NOFO's New Criteria and selection process are ultra vires .............. 36

II. Defendants have unlawfully withheld or unreasonably delayed agency action by failing to award CoC Builds funds by the statutory deadline................................................................. 37

III. The Court should tailor relief to ensure that the funds are awarded consistent with congressional intent ...................................................................................................................... 40

A.    The Court should set aside the September 5 NOFO's New Criteria and one-week application period ................................................................................................................. 40

B.    The Court should permanently enjoin Defendants from imposing the New Criteria or substantially similar criteria on CoC Builds grants ....................................................... 41

C.    The Court should compel Defendants to award the CoC Builds funding pursuant to lawful criteria and process................................................................................................... 42

CONCLUSION................................................................................................................................. 42

# TABLE OF AUTHORITIES

**CASES**

Page(s)

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013) ...................... 34, 36

*Ahadian v. Rubio*, No. 24-cv-12168, 2025 WL 1617224 (D. Mass. June 6, 2025)................... 37

*AIDS Vaccine Advocacy Coal. v. U.S. Dep't of State,* 25-cv-00400, 2025 WL 2537200
(D.D.C. Sept. 3, 2025) .......................................................................................... 38

*Am. Academy of Pediatrics v. FDA*, 330 F. Supp. 3d 657 (D. Mass. 2018).......................... 38

*Am. Fed. of Gov't Employees, AFL-CIO v. Freeman*, 498 F. Supp. 651 (D.D.C. 1980) ............ 27

*Asante v. Azar*, 656 F. Supp. 3d 185 (D.D.C. 2023).................................................... 25

*Asante v. Kennedy*, 133 F.4th 97 (D.C. Cir. 2025) ..................................................... 25

*Bd. of Governors of the Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32 (1991) ...................... 36

*Bennett v. Spear*, 520 U.S. 154 (1997) ..................................................................... 18

*Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42 (1st Cir. 2016) ............................... 17

*Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020) ........................................................... 25

*Boston Chapter, NAACP, Inc. v. Beecher*, 371 F. Supp. 507 (D. Mass. 1974) ........................... 42

*California v. Trump,* No. 25-cv-10810, 2025 WL 2663106 (D. Mass. Sept. 17, 2025)............... 37

*California v. U.S. DOT*, 2025 No. 25-cv-208; 2025 WL 3072541 (D.R.I. Nov. 4, 2025) .......... 32

*Chamber of Com. of U.S. v. CFPB*, 691 F. Supp. 3d 730 (E.D. Tex. 2023)................................ 41

*City & Cnty. of S.F. v. Trump*, 897 F.3d 1225 (9th Cir. 2018) ........................................ 28, 29, 30

*City of Arlington v. FCC*, 569 U.S. 290 (2013) ........................................................... 20

*City of Chicago v. Barr*, 961 F.3d 882 (7th Cir. 2020)........................................................ 28, 30

*City of Providence v. Barr*, 954 F.3d 23 (1st Cir. 2020)..................................................... 20

*Clinton v. City of N.Y.*, 524 U.S. 417 (1998) ............................................................ 29

*Colorado v. Dep't of Health & Human Servs.*, 783 F. Supp. 3d 641 (D.R.I. 2025)................... 26

*Colorado v. U.S. Dep't of Health & Human Servs.*, 788 F. Supp. 3d 277 (D.R.I. 2025)............. 29

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799 (2024).......................... 40

*Correctional Servs. Corp. v. Malesko*, 534 U.S. 61 (2001).......................................................... 28

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009).................................................... 22, 24

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021)............................................................. 22

*Forest Guardians v. Babbitt*, 174 F.3d 1178 (10th Cir. 1999) ..................................................... 37

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010)..................................... 27

*Fresno Cmty. Hosp. & Med. Ctr. v. Cochran*, 987 F.3d 158 (D.C. Cir. 2021) ............................ 37

*Gen. Elec. Co. v. EPA*, 290 F.3d 377 (D.C. Cir. 2002) ................................................................ 18

*Gundy v. United States*, 588 U.S. 128 (2019)............................................................................... 21

*Heart 6 Ranch, LLC v. Bernhardt*, 365 F. Supp. 3d 105 (D.D.C. 2019) ..................................... 17

*Illinois v. FEMA*, No. 25-cv-206, 2025 WL 2716277 (D.R.I. Sept. 24, 2025)...................... 31, 32

*La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986)................................................................. 20

*Louisiana v. Biden*, 622 F. Supp. 3d 267 (E.D. La. 2022)........................................................... 23

*Make the Rd. N.Y. v. Pompeo*, 475 F. Supp. 3d 232 (S.D.N.Y. 2020)........................................ 27

*Manguriu v. Lynch*, 794 F.3d 119 (1st Cir. 2015) ...................................................................... 26

*Martin Luther King, Jr. Cnty. v. Turner*, 785 F. Supp. 3d 863
    (W.D. Wash. 2025) ....................................................................................... 21, 22, 23, 28

*Massachusetts v. Nat'l Insts. of Health*, 770 F. Supp. 3d 277 (D. Mass. 2025) ......................... 42

*Michigan v. EPA*, 576 U.S. 743 (2015) ....................................................................................... 22

*Mistretta v. United States*, 488 U.S. 361 (1989).......................................................................... 20

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010)...................................................... 41

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)........................................................................................................... 22

*Multnomah Cnty. v. Azar*, 340 F. Supp. 3d 1046 (D. Or. 2018) ................................................... 19

*Nat'l Council of Nonprofits v. OMB*, 763 F. Supp. 3d 36 (D.D.C. 2025) ............................ 23, 27

*Nat'l Fed'n of Indep. Business v. Sebelius*, 567 U.S. 519 (2012) ................................................. 33

*NEA v. Finley*, 524 U.S. 569 (1998) .......................................................................................... 34

*New York v. Kennedy*, 789 F. Supp. 3d 174 (D.R.I. 2025) ........................................................ 22

*New York v. United States*, 505 U.S. 144 (1992) ....................................................................... 32

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004) ........................................................ 37, 40

*Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665 (2025) ............................................................. 36

*O'Connell v. Shalala*, 79 F.3d 170 (1st Cir. 1996) .................................................................... 29

*Ohio v. EPA*, 603 U.S. 279 (2024) ....................................................................................... 22, 24

*Ortiz-Bonilla v. Federacion de Ajedrez de Puerto Rico, Inc.*, 734 F.3d 28 (1st Cir. 2013) ......... 42

*Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1 (1981) ............................................... 31

*PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405 (D. Md. 2025) ............................................... 28, 29

*Planned Parenthood of N.Y.C., Inc. v. HHS*, 337 F. Supp. 3d 308 (S.D.N.Y. 2018) .................. 19

*R.I. Coal. Against Domestic Violence v. Bondi*, No. 1:25-cv-00279, 2025 WL 2271867
      (D.R.I. Aug. 8, 2025) ....................................................................................................... 23

*R.I. Coal. Against Domestic Violence v. Kennedy*,
      No. 25-cv-342; 2025 WL 2988705 (2025) ................................................................... 35, 36

*R.I. Dep't of Env't Mgmt. v. United States*, 304 F.3d 31 (1st Cir. 2002) .................................... 37

*R.I. Latino Arts v. Nat'l Endowment for the Arts*, No. 1:25-cv-00079, 2025 WL 2689296
      (D.R.I. Sept. 19, 2025) ..................................................................................................... 23

*R.I. Latino Arts v. NEA*, 777 F. Supp. 3d 87 (D.R.I. Apr. 3, 2025) .......................................... 35

*Rust v. Sullivan*, 500 U.S. 173 (1991) ................................................................................. 34, 36

*S.F. AIDS Found. v. Trump*, 786 F. Supp. 3d 1184 (N.D. Cal. 2025) ........................................ 35

*Sackett v. EPA*, 566 U.S. 120 (2012) ........................................................................... 18

*Scottsdale Ins. v. United Rentals (N. Am.), Inc.*, 977 F.3d 69 (1st Cir. 2020) .............................. 17

*South Dakota v. Dole*, 483 U.S. 203 (1987) ........................................................ 29, 30, 31, 32

*Telecommunications Research and Action Center v. FCC*, 750 F.2d 70
    (D.C. Cir. 1984) .................................................................................. 38, 39, 40

*Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*,
    576 U.S. 519 (2015).................................................................................... 25

*Texas v. Cardona*, 743 F. Supp. 3d 824 (N.D. Tex. 2024) ........................................... 41

*Viscito v. Nat'l Plan. Corp.*, 34 F.4th 78 (1st Cir. 2022).................................................... 17

*W. Watersheds Project v. Zinke*, 336 F. Supp. 3d 1204 (D. Idaho 2018) .................................... 19

*Washington v. Trump*, 768 F. Supp. 3d 1239 (W.D. Wash. 2025) ............................................... 28

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440
    (D.R.I. 2025)................................................................................... 23, 27

**US CONSTITUTIONAL PROVISIONS**

Amendment I .......................................................................................... 34

Amendment X ......................................................................................... 32

Article I
    § 1........................................................................................ 29
    § 7........................................................................................ 29
    § 8........................................................................................ 29
    § 9........................................................................................ 29

Article II
    § 3........................................................................................ 30

**STATUTES**

5 U.S.C.
    § 704...................................................................................... 18
    § 706............................................................................ 18, 19, 25, 40, 42

21 U.S.C.
    § 856......................................................................................... 6

42 U.S.C.
    § 1138.................................................................................................... 8
    § 2000e–2(a)(1)..................................................................................... 25
    § 3545(5)................................................................................................ 9
    § 3545(a)(3)................................................................................. 9, 26, 39
    § 3604(a)................................................................................................ 25
    § 11301.................................................................................................. 7
    § 11313(a)(12)....................................................................................... 9
    § 11360(29)........................................................................................... 7
    § 11381............................................................................................. 7, 21
    § 11383.......................................................................................... 7, 8, 9
    § 11386.................................................................................................. 8
    § 11386a....................................................................................... 8, 9, 21
    § 12711............................................................................................. 8, 19

Consolidated Appropriations Act of 2023, Pub. L. No. 117-328, div. L, tit. II,
    136 Stat. 4459 (2002).................................................................. 7. 8, 38

Pub. L. No. 100-77, § 102, 101 Stat. 482, 484 ............................................. 6

Pub. L. No. 111-22, div. B, tit. III, § 1301(2), 123 Stat. 1632, 1680............. 7

## REGULATIONS

2 C.F.R.
    § 200.204.............................................................................................. 26

24 C.F.R.
    § 5.106............................................................................................ 10, 25
    § 84.1.................................................................................................... 26
    § 85.1.................................................................................................... 26
    § 578.3.................................................................................................... 7
    § 578.7.................................................................................................... 7
    § 578.9.................................................................................................... 7

## OTHER AUTHORITIES

90 Fed. Reg. 47809 (Oct. 2, 2025)............................................................... 13

Exec. Order No. 14159, 90 Fed. Reg. 8443, 8446 (Jan. 20, 2025)................. 4

Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025).......................... 4

Exec. Order No. 14218, 90 Fed. Reg. 10581 (Feb. 19, 2025) ....................... 4

Exec. Order No. 14287, 90 Fed. Reg. 18761 (Apr. 28, 2025) ................................................. 4, 5, 6

Exec. Order No. 14321, 90 Fed. Reg. 35817 (July 24, 2025) .................................................. 5, 8

Exec. Order No. 14332, 90 Fed. Reg. 38929 (Aug. 7, 2025) ......................................................... 5

H.R. Rep. No. 101-922 (Conf. Rep.), 136 Cong. Rec. H11518-12 (Oct. 22, 1990) ..................... 8

S. Rep. 101-316, 1990 U.S.C.C.A.N. 5763, 5806 (1990) ............................................................. 8

Press Release, Dep't of Just. Off. of Pub. Affs., Justice Department Publishes List of
    Sanctuary Jurisdictions (Aug. 5, 2025), https://perma.cc/VS2J-RYYH .............................. 4

Rob Moore, *Which States Rely the Most on Federal Funds,* Scioto Analysis (Feb. 19, 2025),
    https://perma.cc/49EP-Q875 ................................................................................................. 33

## INTRODUCTION

Recognizing the pressing need to build more housing for unhoused individuals and families, Congress appropriated $75 million for grants to nonprofits, states, or localities to build permanent supportive housing—and directed the Department of Housing and Urban Development (HUD) to award those funds by September 30, 2025. HUD solicited applications for these awards twice, in summer 2024 and then again, after a change in administrations, in May of this year—well in advance of the September 30 deadline. It reviewed the applications, selected awardees, and even went so far as to notify members of Congress of the selections. But before actually finalizing those awards, it abruptly reversed course. On September 5—just weeks before the funds were set to expire—it issued a new notice of funding opportunity (NOFO) with new eligibility criteria that seek to coerce organizations addressing homelessness, and their states and localities, into carrying out the Administration's ideological and policy goals. HUD sought to rush the funds out the door, imposing an unprecedented (and unlawful) seven-day application period and promising to make awards on a first-come, first-served basis to projects that clear its ideological threshold.

The September 5 NOFO disqualifies from consideration any entity seeking to build housing in a state or locality with policies the Administration disfavors: Projects are eligible only if they are in a jurisdiction that helps enforce federal immigration law and that has adopted the Administration's preferred approach to local homelessness policies. Even in jurisdictions with policies the Administration deems acceptable, entities effectively cannot compete for funding unless they profess agreement with the Administration's view that sex is binary and immutable and foreswear operating safe injection sites or similar programs designed to reduce the harm from drug use, even with wholly non-federal funds.

1

This is unlawful. The September 5 NOFO's new criteria violate the APA and multiple constitutional commands. Congress did not authorize HUD to impose these criteria—and in fact specifically prohibited HUD from basing funding awards on what laws and policies states and localities have in place. In addition, binding HUD regulations require grantees to recognize and respect the gender identity of participants, and federal statutes prohibit discrimination based on gender identity. The new criteria conflict with these prohibitions, exceed HUD's statutory authority, and are arbitrary and capricious to boot.

The new criteria are also unconstitutional. In our constitutional system, Congress controls the purse strings and decides what funding to provide, for what purposes, and under what criteria. HUD transgressed the separation of powers by imposing criteria that Congress did not authorize. Our constitutional system also lets states and localities decide what policies to adopt and implement in their own local jurisdictions. HUD impermissibly trenched on states' and localities' constitutional role, in violation of the Spending Clause and the Tenth Amendment, by leveraging federal funding to push them to abandon the policies their own citizens have chosen and to implement the Administration's ideological and policy agenda instead. And HUD straightforwardly violates the First Amendment in requiring applicants to commit to the Administration's views on gender to have a chance to compete.

The September 5 NOFO's seven-day application period is unlawful as well. By statute, HUD must post the criteria for making awards at least 30 days before the application deadline, except in cases of "emergency." No emergency existed here.

As a result of its last-minute shenanigans, HUD failed to take action that Congress required: It unreasonably delayed in making the awards and ultimately failed to heed Congress's

command that HUD award the $75 million in funding by September 30. That failure, too, was unlawful.

Both the process and substance of this new award process are shockingly unlawful and irreparably injure qualified applicants and the communities they serve, including Plaintiffs, the National Alliance to End Homelessness, on behalf of its members, and the Women's Development Corporation, a Rhode Island nonprofit that develops and operates quality, affordable housing. The Court should grant summary judgment to Plaintiffs on all their claims and (1) set aside the September 5 NOFO, the new criteria, and the one-week application period; (2) permanently enjoin Defendants from implementing the same or substantially similar criteria again; (3) continue exercising its equitable authority to preserve the appropriated funds for award; and (4) compel Defendants to award the $75 million that Congress appropriated pursuant to lawful criteria and process.

## BACKGROUND

### A. The Administration leverages federal funding to advance unrelated policy goals and to punish jurisdictions with disfavored policies

The Administration has launched a far-reaching campaign to leverage federal grant funding to advance ideological and policy goals wholly unrelated to the purposes of the grant programs Congress created and to coerce states and localities to abandon their own local policies in favor of ones the Administration prefers. Relevant here, President Trump has issued a series of executive orders targeting illegal immigration, so-called "gender ideology," and people experiencing homelessness.

### 1. Immigration

Through a series of executive orders starting on his first day in office, the President has taken aim at states and localities that he deems insufficiently cooperative with federal

immigration enforcement. Among other things, those orders instruct federal agencies to "ensure that so-called 'sanctuary' jurisdictions … do not receive access to Federal funds." *Protecting the American People Against Invasion* § 17, Exec. Order No. 14159, 90 Fed. Reg. 8443, 8446 (Jan. 20, 2025); *see also Ending Taxpayer Subsidization of Open Borders* § 2(a), Exec. Order No. 14218, 90 Fed. Reg. 10581, 10581 (Feb. 19, 2025) (similar); *Protecting American Communities from Criminal Aliens* § 3(a), Exec. Order No. 14287, 90 Fed. Reg. 18761, 18761 (Apr. 28, 2025) (similar). Pursuant to one such order, the Attorney General has published a list of "sanctuary jurisdictions"—"States and local jurisdictions" that the Administration deems to "obstruct the enforcement of Federal immigration laws." *See* Exec. Order No. 14287 § 2, 90 Fed. Reg. at 18761; Press Release, Dep't of Just. Off. of Pub. Affs., *Justice Department Publishes List of Sanctuary Jurisdictions* (Aug. 5, 2025), https://perma.cc/VS2J-RYYH. The list is "not exhaustive" but identifies 13 states (including Rhode Island) as well as 22 cities and counties. Press Release, Dep't of Just. Off. of Pub. Affs., *Justice Department Publishes List of Sanctuary Jurisdictions* (Aug. 5, 2025), https://perma.cc/VS2J-RYYH. The President has instructed agencies to take action against the jurisdictions on that list, including by suspending or terminating federal funds. Exec. Order No. 14287 § 3(a), 90 Fed. Reg. at 18761-62.

### 2. *"Gender Ideology"*

The Administration has also launched a broadside attack on the rights and dignity of transgender people. On January 30, the President issued an executive order titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025) ("Gender Ideology" E.O.). That Order announces that "the policy of the United States" is "to recognize two sexes, male and female," that are "not changeable and are grounded in fundamental and incontrovertible reality." *Id.* § 2. It decries "the erasure of sex" in both "policy" and "language,"

and it commits to using what the Administration considers "accurate language and policies that recognize women are biologically female, and men are biologically male." *Id.* § 1. As part of its campaign to deny the very existence of transgender people, the Order, among other things, requires each agency to "ensure grant funds do not promote gender ideology." *Id.* § 3(g). The Order defines "gender ideology" as one that "replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity" and includes the "false" belief that "males can identify as and thus become women and vice versa." *Id.* § 2(f).

In August, the President reiterated the command that agencies deny grant funding to anyone who disagrees with the Administration's views on gender. In an executive order broadly addressing federal grantmaking, the President commanded that agencies ensure discretionary grant awards do not fund or facilitate "denial by the grant recipient of the sex binary in humans or the notion that sex is a chosen or mutable characteristic." *Improving Oversight of Federal Grantmaking* § 4(b)(ii)(B), Exec. Order No. 14332, 90 Fed. Reg. 38929, 38931 (Aug. 7, 2025) (Grants E.O.).

### 3. *Homelessness*

The Administration also took aim at people experiencing homelessness in an executive order entitled "Ending Crime and Disorder on America's Streets." Exec. Order No. 14321, 90 Fed. Reg. 35817 (July 24, 2025) (Homelessness E.O.). That executive order announced a "new approach" to homelessness policy that emphasizes using "civil commitment" to "shift[] homeless individuals into long-term institutional settings," supports punishing people for being homelessness, and directs agencies to abandon proven "housing first" policies—that is, evidence-based policies that provide housing to unhoused people while also offering, but not mandating, supportive services to address underlying issues such as drug use or mental health conditions. *Id.* §§ 1, 3, 5(a)-(b).

The Homelessness E.O. goes beyond setting new federal policy and attempts to pressure states and localities to adopt and implement the Administration's preferred policies at the local level as well. In particular, the executive order instructs various agencies, including HUD, to prioritize giving grants to grantees in states and municipalities that have adopted and implemented local policies that align with the Administration's views. *Id.* § 3(a). The executive order directs HUD and other agencies to give preference to grantees in states and municipalities that: enforce prohibitions on "open illicit drug use," on "urban camping and loitering," and on "urban squatting"; that adopt and enforce standards to civilly commit not only those "individuals who are a danger to themselves or others" but also those who "are living on the streets and cannot care for themselves"; and that substantially implement the Sex Offender Registry Notification Act (SORNA)'s registration and notification obligations, including by adequately tracking "homeless sex offenders." *Id.* § 3(a).

The Homelessness E.O. also targets "drug injection sites" or "safe consumption" sites that aim to reduce the risk of overdose and drug-use-related disease and to keep needles off the streets, asserting (without evidence) that they "only facilitate illegal drug use and its attendant harm." *Id.* § 4(a)(i). Among other things, the Order directs HHS not to fund such sites, *id.*; directs the Attorney General to consider prosecuting such organizations for operating "drug-involved premises" (citing 21 U.S.C. § 856), *id.* § 5(c)(1); and directs HUD to review whether recipients that operate such harm reduction sites are violating the terms of their federal grants and to "freeze" their funding as appropriate, *id.* § 5(c)(ii).

## B. HUD creates the Continuum of Care grant program to address homelessness

Congress enacted the McKinney-Vento Homeless Assistance Act (Homeless Assistance Act) in 1987 to establish a coordinated federal response to homelessness, including by providing funds for programs to assist homeless individuals and families. Pub. L. No. 100-77, § 102, 101

Stat. 482, 484-85 (1987), *codified at* 42 U.S.C. § 11301. In 2009, Congress passed the Homeless Emergency Assistance and Rapid Transition to Housing (HEARTH) Act, which amended the Homeless Assistance Act to establish the Continuum of Care (CoC) program, a program designed to help individuals and families experiencing homelessness move into transitional and permanent housing, with the goal of long-term stability. Pub. L. No. 111-22, div. B, tit. III, § 1301(2), 123 Stat. 1632, 1680-84 (2009), *codified at* 42 U.S.C. § 11381.

A CoC is a group organized to coordinate housing and other homelessness services in a particular geographic area. *See* 24 C.F.R. §§ 578.3, 578.7.[1] Among other things, a CoC must coordinate applications for grants to address homelessness in the CoC's region, including by establishing priorities, selecting which projects can apply for funding, and designating a "collaborative applicant" responsible for coordinating and submitting all funding applications for the region. *See id.* § 578.9. CoC grants can fund a wide variety of programs that help unhoused individuals and families, including by constructing new housing units for permanent or transitional housing, rehabilitating structures to provide such housing, providing rental assistance, and offering supportive services such as child care, job training, healthcare, mental health services, trauma counseling, and life skills training. 42 U.S.C. §§ 11383(a), 11360(29).

In 2022, in addition to amounts appropriated for the CoC program generally, Congress appropriated $75 million for "one-time awards under the Continuum of Care program for new construction, acquisition, or rehabilitation of new permanent supportive housing." Consolidated

---

[1] This group may include "representatives of organizations, including nonprofit homeless providers, victim service providers, faith-based organizations, governments, businesses, advocates, public housing agencies, school districts, social service providers, mental health agencies, hospitals, universities, affordable housing developers, law enforcement, organizations that serve homeless and formerly homeless veterans, and homeless and formerly homeless persons." 24 C.F.R. § 578.3.

Appropriations Act of 2023, Pub. L. No. 117-328, div. L, tit. II, 136 Stat. 4459, 5160 (2022). The appropriations act specifies that "these amounts shall be awarded on a competitive basis, based on need and other factors to be determined by the Secretary, including incentives to establish projects that coordinate with housing providers, healthcare organizations and social service providers." *Id.* Congress provided that those funds would remain available until September 30, 2025. *Id.* at 5158.

### C. Statutes and regulations govern how HUD can administer grant funding

A range of statutory and regulatory provisions govern HUD's administration of grant funding. To begin, Congress adopted agency-wide restrictions that aim to ensure that HUD does not unduly interfere in state and local policymaking. As relevant here, 42 U.S.C. § 12711 bars HUD from "establish[ing] any criteria for allocating or denying funds … based on the adoption, continuation, or discontinuation by a jurisdiction of any public policy, regulation, or law" so long as the jurisdiction had authority to adopt, continue, or discontinue it and it does not violate federal law. That provision applies to any "funds made available under programs administered by the Secretary" of HUD. *Id.* Congress made clear that it adopted this provision to ensure that HUD would not have "new authority to intervene in state and local decision-making." H.R. Rep. No. 101-922 (Conf. Rep.), 136 Cong. Rec. H11518-12, H11622 (Oct. 22, 1990); S. Rep. 101-316, 1990 U.S.C.C.A.N. 5763, 5806 (1990).

Congress also established statutory directives governing CoC grants in particular, including provisions delineating which activities are eligible for funding, selection criteria that HUD must apply to awards, and the program requirements that grantees must agree to as a condition of receiving funds. 42 U.S.C. §§ 11383, 11386a, 11386. For instance, the Homeless Assistance Act requires the HUD Secretary to establish certain "required" selection criteria that the Secretary must use to evaluate grant applications—like the applicant's track record in

reducing the length of homelessness, helping unhoused individuals get jobs, and "other accomplishments … related to reducing homelessness." *Id.* § 11386a. The Act also specifies the "[r]equired agreements" to which grant recipients must agree to receive funds under the program. *Id.* § 11386(b). For instance, recipients must agree to operate funded projects in accordance with statutory requirements, to involve individuals experiencing homelessness in project operations where practicable, and to certify that children in family programs are enrolled in school and connected to services such as Head Start and Individuals with Disabilities Education Act programs. *Id.* The Homeless Assistance Act authorizes the HUD Secretary to promulgate regulations establishing other selection criteria and other terms and conditions on grant funding—but only "to carry out [the CoC program] in an effective and efficient manner." *Id.* §§ 11386(b)(8); 11386a(b)(1)(G). The statute nowhere mentions anything about immigration enforcement, compliance with SORNA, safe drug use sites and other harm-reduction programs, grantees' views on gender, or localities' policies on urban camping, squatting, public drug use, or civil commitment.[2]

Other statutes and rules govern the process that HUD must follow when awarding or otherwise administering grants. Under the HUD Reform Act of 1989, HUD must publish the criteria by which it will select awardees at least 30 days before any deadline to apply for a grant. 42 U.S.C. § 3545(a)(3). This 30-day requirement can be waived only if "required for appropriate response to an emergency." *Id.* § 3545(a)(5).

---

[2] In fact, far from encouraging such local policies, the same law that created the CoC program (the HEARTH Act) directed an advisory body to "develop constructive *alternatives* to … laws and policies that prohibit sleeping, feeding, sitting, resting, or lying in public spaces." Pub. L. No. 111-22, § 1004(a)(3)(G), 123 Stat. at 1667, *codified at* 42 U.S.C. § 11313(a)(12) (emphasis added).

HUD regulations also govern the activities of recipients of CoC funds. For instance, HUD's Equal Access Rule imposes nondiscrimination requirements that specifically protect transgender individuals. That Rule applies to CoC-funded programs and requires CoC grantees, among other things, to provide individuals equal access to accommodations, programs, and other benefits "in accordance with the individual's gender identity" and to "place[], serve[], and accommodate[]" individuals "in accordance with the[ir] gender identity. 24 C.F.R. § 5.106.

### D.  HUD issues notices of funding opportunity for CoC Builds grants in July 2024 and May 2025

After Congress appropriated $75 million specifically for CoC Builds grants—that is, grants to support permanent supportive housing under the CoC programs—HUD issued a notice of funding opportunity (NOFO) in July 2024 to solicit applications. AR301, 423. Although applications were due on December 5, 2024, AR426, HUD did not complete the process in time to make awards before the change in Administrations.

To "align[] with the President's Executive Orders and the goals of the Administration," the new Administration revamped the NOFO and issued a new one in May 2025. AR5. By then, it was already getting late in light of the September 30 deadline to award funds. *See* AR39-40. HUD accordingly permitted applicants only 45 days to apply rather than the "standard" 60 days. AR39. HUD received 107 applications in response to that NOFO, undertook three layers of review, and selected 14 applicants for awards. AR232-33. HUD even went so far as to notify Congress in early August that those organizations had received awards. *See* AR234, 526-27, 641, 1465. But it never actually granted awards to those organizations.

### E.  HUD issues a last-minute new NOFO with unprecedented new criteria and process

Instead, on September 5, HUD issued a new NOFO with a deadline of 3 p.m. on September 12—an unprecedented one-week turnaround that would be virtually impossible for

many would-be applicants to meet. AR2116; *see also* AR39; Declaration of Ann Marie Oliva (Oliva Decl.) ¶¶ 18-19, 42. HUD made clear that it was issuing the new NOFO to "uphold[] the President's Executive Orders on homelessness and the grantmaking process"—referring to the Homelessness E.O. and the Grants E.O. AR1, 89. HUD noted that the executive orders "take positive steps to promote recovery and self-sufficiency for vulnerable Americans" (AR 1, 89) but did not otherwise explain the new NOFO's criteria, or even explain how the criteria in the NOFO advanced those goals. A HUD official noted that the new NOFO "likely violates" various court orders but explained that he had "been instructed to proceed anyway" and "not to seek legal advice from our Program Counsel or Office of Litigation." AR586.

The September 5 NOFO established an unprecedented selection process and imposed a host of new eligibility and selection criteria untethered to the statute. *See* AR2136-49. The new criteria include criteria (collectively, New Criteria) designed to exclude projects located in any state, county, or city with policies the Administration disfavors (Jurisdiction-Based Criteria), as well as criteria based on activities the applicant engages in on its own dime, outside the scope of the grant program (Applicant-Based Criteria).

As for the Jurisdiction-Based Criteria, the NOFO requires that the proposed project be located in a jurisdiction (state, county, city) that:

    a.  Cooperates with federal immigration enforcement (Immigration Enforcement Jurisdiction-Based Criteria);

    b.  Prohibits public camping or loitering and enforces that prohibition (Camping Enforcement Jurisdiction-Based Criteria);

    c.  Prohibits public illicit drug use and enforces that prohibition (Drug Enforcement Jurisdiction-Based Criteria);

    d.  Prohibits urban squatting and enforces that prohibition (Squatting Enforcement Jurisdiction-Based Criteria);

    e. "Utilizes standards that address individuals who are a danger to themselves or others" (Involuntary Commitment Jurisdiction-Based Criteria); and

    f. "Substantially implements and complies with SORNA, particularly in the case of registered sex offenders with no fixed address, including by adequately mapping and checking the location of homeless sex offenders" (SORNA Jurisdiction-Based Criteria).

AR2137-38, 2144-45.

And the Applicant-Based Criteria—which look beyond the scope of the federally funded program to *all* of the applicant's activities—require the applicant to commit that:

    g. It "does not and will not deny the sex binary in humans or promote the notion that sex is a chosen or mutable characteristic" (Sex Binary Criteria); and

    h. It "does not," and "will not," "operate drug injection sites or 'safe consumption sites,' knowingly distribute drug paraphernalia on or off of property under their control, permit the use or distribution of illicit drugs on property under their control, or conduct any of these activities under the pretext of 'harm reduction'" (Safe Drug Use Criteria).

AR2140, 2145, 2147-48.

The NOFO establishes a three-step process for reviewing awards, with unlawful new criteria at each step, and often with the same criteria appearing at multiple steps. AR2137-48. First is the "threshold review" step, at which HUD reviews each application to make sure it meets specified "threshold requirements." AR2137. If an applicant meets all threshold requirements, it will advance to the next step. AR2138, 2148. If it does not meet all threshold requirements, the application is not eligible for funding. AR2137. The "threshold" requirements include requirements that categorically disqualify projects based in state and local jurisdictions with policies the Administration disfavors. In particular, the "threshold" requirements include the Immigration Enforcement, Camping Enforcement, Drug Enforcement, and Squatting Enforcement Jurisdiction-Based Criteria. AR2137-38.

Second is the "merit review" step. AR2138-47. For this step, applicants must indicate— with a "yes" or "no" answer—whether they satisfy the so-called "merit criteria." AR2138. The criteria at the "merit review" step include multiple requirements—both Jurisdiction-Based Criteria and Applicant-Based Criteria—that advance the Administration's ideological goals at the expense of the purposes of the program Congress created. In particular, the "merit" criteria include the Immigration Enforcement, Camping Enforcement, Drug Enforcement, Involuntary Commitment, and SORNA Jurisdiction-Based Criteria, as well as the applicant-based Safe Drug Use Criterion and Sex Binary Criterion. AR2140, 2144-45.

Third, HUD conducts a "risk review," ostensibly to evaluate each applicant's likelihood of successfully implementing an award. AR2147. The "risk review" looks at standard factors like the applicant's financial stability, history of performance, audit findings, and staffing structure. AR2147. But the September 5 NOFO's "risk review" criteria also look to the "[e]xistence of evidence" that the applicant meets the Safe Drug Use Criteria and Sex Binary Criteria. AR2147-48.

The NOFO states that HUD will make awards to the first eight or so applicants who meet the "threshold" criteria and answer "yes" to all the "merit" criteria, in the order of submission timestamp, until the full $75 million is awarded. AR2121, 2148-49. It does not state how HUD intends to apply the "risk review" criteria. *See generally* AR2147-49. The NOFO states that HUD would make awards and obligate the funds "by September 15, 2025," that is, by the Monday immediately after the Friday application deadline. AR2161.

About a month after issuing the NOFO, as required by the HUD Reform Act, HUD published in the Federal Register its reasons for departing from the minimum 30-day application period required by statute. 90 Fed. Reg. 47809 (Oct. 2, 2025). HUD explained that the "exigent

and emergency circumstances" justified a truncated application period because "HUD is required by statute to obligate the CoC funds before they expire on September 30, 2025." 90 Fed. Reg. at 47810. HUD noted that "several activities must occur prior to obligating this funding" and that it had to "ensure that there is adequate time to complete all necessary actions before the statutory deadline." *Id.* As for why it waited so long, HUD explained that the new "administration needed adequate time" to ensure that HUD's "grantmaking activity aligned with the current administration's policy priorities." *Id.* It pointed to the Homelessness E.O. and the Grants E.O., which the President had issued on July 24 and August 7, respectively, and explained that HUD had revamped the CoC Builds NOFO to align with those executive orders. *Id.* Without evidence, HUD also asserted that the seven-day application period still gave applicants "sufficient time" to prepare and submit applications. *Id.*

### F. The September 5 NOFO harms Plaintiffs

The September 5 NOFO's New Criteria and selection process have prevented countless organizations, including Plaintiff Women's Development Corporation (WDC) and members of Plaintiff National Alliance to End Homelessness (Alliance), from competing fairly for CoC Builds grants. The unprecedented NOFO has also drained the Alliance's resources, as it forced the Alliance to divert time and attention from its ordinary activities to help members understand whether and how they could seek funds under the New Criteria.

The Alliance is a nonprofit, nonpartisan membership organization that works to end homelessness in the United States. Oliva Decl. ¶ 4. Its members include other nonprofit organizations, service providers, practitioners, local researchers, local and state government entities, and people experiencing or with a history of homelessness—all of which are dedicated to ending homelessness and many of which apply for and receive HUD CoC grants. *Id.* ¶ 6. Plaintiff Women's Development Corporation (WDC) is a nonprofit headquartered in Rhode

14

Island that develops and operates quality, affordable housing for low- and moderate-income families, people with special housing needs, and seniors living in Rhode Island and surrounding states. Declaration of Frank Shea (Shea Decl.) ¶ 3. Plaintiff WDC is a member of the Alliance. *Id.* ¶ 5; Oliva Decl. ¶ 25.

Many Alliance members, including Plaintiff WDC, build housing for homeless populations and would ordinarily apply for CoC Builds grants. Oliva Decl. ¶¶ 29, 43; Shea Decl. ¶¶ 6, 14; Declaration of Jennifer Hill (Hill Decl.) ¶¶ 3, 5, 7, 14. For instance, Plaintiff WDC applied for CoC Builds funds twice previously, including under the May 2025 NOFO—and learned that HUD had selected WDC for an award, although HUD never actually made the award or entered into a grant agreement with WDC. Shea Decl. ¶¶ 6-8, 11; *see also* Oliva Decl. ¶¶ 32-33. Other Alliance members previously applied (and, in some cases, were selected) as well. Oliva Decl. ¶ 43; Hill Decl. ¶¶ 5, 9. Those members and others would have liked to compete for CoC Builds funding. *Id.*; Shea Decl. ¶ 14. But the September 5 NOFO effectively prevented them from doing so, or prevented them from fairly competing for the funds. The NOFO's seven-day deadline alone made it impossible for some members to apply, and even if they could apply, the New Criteria disqualified them from fair consideration. Oliva Decl. ¶¶ 42-45; Shea Decl. ¶¶ 14-26; Hill Decl. ¶¶ 15-18. The NOFO therefore threatens irreparable harm to WDC and other Alliance members because it would irretrievably deprive them of the opportunity to compete for the funding on fair and lawful terms.

The September 5 NOFO has also harmed the Alliance itself. Members flooded the Alliance with questions and requests relating to the unprecedented NOFO—forcing the Alliance to divert its time and attention away from other important work. Oliva Decl. ¶ 46-51. If HUD

were to recompete the CoC Builds funding using the same New Criteria, the Alliance would suffer the same diversion of resources to help members navigate the application. *Id.* ¶ 52.

### G. Procedural history

On the morning of September 11, Plaintiffs filed suit against HUD and its head, Secretary Scott Turner, to challenge the September 5 NOFO's new criteria and process. ECF No. 1. Plaintiffs also sought a temporary restraining order blocking HUD from awarding funds pursuant to the unlawful new NOFO and preserving the status quo so that Plaintiffs would ultimately be able to compete for the funds pursuant to lawful criteria. ECF No. 2. The Court held a hearing the next day. At the hearing, the government said that it was "not going to defend" the Sex Binary Criterion "as it is stated currently" but that the intent was to prevent "use of federal funds to promote gender ideology." TRO Hrg. Tr. at 16-17. The government otherwise opposed Plaintiffs' claims. *See generally id.* at 15-32. Despite declining to defend the Sex Binary Criterion as written at the hearing, HUD has taken no action to formally rescind it.

The Court orally granted the TRO at the hearing, *id.* at 34-36, and memorialized it in a written order two days later, ECF No. 14. The TRO bars Defendants from awarding funds pursuant to the September 5 NOFO and suspends the September 30 statutory lapse of funds, among other things. *Id.* On the parties' joint motion, the Court later entered a clarified TRO that expressly stated that it would remain in effect until further order of the Court. ECF No. 18; *see also* ECF No. 16 (Joint Motion). The parties agreed to proceed expeditiously to cross-motions for summary judgment. ECF No. 16.

Plaintiffs have since amended their complaint to add new claims, including a claim that Defendants unlawfully withheld or unreasonably delayed agency action by failing to award CoC Builds funds by the September 30 deadline. ECF No. 25.

## LEGAL STANDARD

Summary judgment "is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Viscito v. Nat'l Plan. Corp.*, 34 F.4th 78, 83 (1st Cir. 2022) (cleaned up). "On cross-motions for summary judgment, each motion is reviewed separately, drawing facts and inferences in favor of the non-moving party." *Scottsdale Ins. v. United Rentals (N. Am.), Inc.*, 977 F.3d 69, 72 (1st Cir. 2020).

In the context of APA claims, "a motion for summary judgment is simply a vehicle to tee up a case for judicial review and, thus, an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action" violates the APA. *Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016); *see also, e.g.*, *Heart 6 Ranch, LLC v. Bernhardt*, 365 F. Supp. 3d 105, 109 (D.D.C. 2019) ("Summary judgment is the mechanism for deciding whether as a matter of law the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." (cleaned up)).

## ARGUMENT

The September 5 NOFO's New Criteria and process are unlawful for a host of reasons. And by failing to lawfully award CoC Builds funds by the September 30 deadline, Defendants have unlawfully withheld or unreasonably delayed agency action. The Court should grant summary judgment to Plaintiffs on all their claims, vacate the New Criteria and one-week application period, enjoin Defendants from using the New Criteria or substantially similar ones to make CoC Builds awards, and compel Defendants to award the $75 million in CoC Builds funds pursuant to lawful criteria and process.

**I. The September 5 NOFO's New Criteria and Application Process Are Unlawful**

The September 5 NOFO's New Criteria and application process violate the APA and multiple constitutional provisions and are ultra vires.

**A. The September 5 NOFO's New Criteria and process must be set aside under the APA**

The September 5 NOFO's criteria and process are reviewable under the APA and must be set aside for multiple different reasons. Under the APA, courts must set aside final agency action if it is contrary to law, exceeds the agency's statutory authority, is arbitrary and capricious, is contrary to the Constitution, or if it was adopted without observing required procedures. 5 U.S.C. §§ 704, 706(2)(A)-(D). The September 5 NOFO's criteria and process fails on each of those fronts. They are reviewable final agency action and must be set aside under the APA for multiple independent reasons.

*1. The September 5 NOFO's criteria and application process are reviewable final agency action*

The September 5 NOFO is final agency action reviewable under the APA. For agency action to be "final," it must (1) "mark the consummation of the agency's decisionmaking process" and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (cleaned up). Both the New Criteria and the application process that the September 5 NOFO establishes satisfy that test.

First, the September 5 NOFO marks the consummation of Defendants' decisionmaking process. Defendants made a final decision to use the criteria and application process described in the September 5 NOFO to select the recipients of CoC Builds grants, as reflected by the fact that it published the NOFO. AR2116-72. While Defendants could have revoked this NOFO and issued a new one, "[t]he mere possibility that an agency might reconsider ... does not suffice to

make an otherwise final agency action nonfinal." *Sackett v. EPA*, 566 U.S. 120, 127 (2012); *see also Gen. Elec. Co. v. EPA*, 290 F.3d 377, 380 (D.C. Cir. 2002) (no action "would ever be final" if the possibility of "future revision in fact could make agency action non-final").

Second, both the New Criteria and the application process that the September 5 NOFO establishes determine rights or obligations and produce legal consequences. As for the New Criteria, the NOFO precludes organizations from even being considered for an award if the organization does not meet the relevant criteria, both by disqualifying them at the "threshold review" step and providing that, at the "merit review" step, the first eight organizations that answer "yes" to all "merit" criteria will automatically win the awards. *See* AR2137-49. As courts have repeatedly held, actions that establish eligibility criteria for federal funding are final agency action reviewable under the APA. *See, e.g.*, *Multnomah Cnty. v. Azar*, 340 F. Supp. 3d 1046, 1056-59 (D. Or. 2018) (collecting cases); *Planned Parenthood of N.Y.C., Inc. v. HHS*, 337 F. Supp. 3d 308, 328-29 (S.D.N.Y. 2018) (same). The NOFO's application process, and in particular its truncated one-week deadline, also produces legal consequences because it controls whether and how organizations can compete for funds. *Cf. W. Watersheds Project v. Zinke*, 336 F. Supp. 3d 1204, 1228 (D. Idaho 2018) (holding that "legal consequences necessarily flow[ed] from" action shortening deadline).

## 2. *The New Criteria violate the APA*

### a. *The Jurisdiction-Based Criteria are contrary to law*

To begin, the Jurisdiction-Based Criteria all must be set aside as "not in accordance with law," 5 U.S.C. § 706(2)(A). By statute, HUD cannot "establish any criteria for allocating or denying funds … based on the adoption, continuation, or discontinuation by a jurisdiction of any public policy, regulation, or law," so long as the policy or law was within the jurisdiction's authority and does not violate federal law. 42 U.S.C. § 12711. The Jurisdiction-Based Criteria

19

flatly conflict with that provision. Each of the Jurisdiction-Based Criteria disqualifies certain applicants based on the laws and public policies of the states in which their proposed projects are based—namely, whether the jurisdiction cooperates with immigration enforcement; substantially implements SORNA; has standards for involuntary commitment; and prohibits, and enforces prohibitions on, public camping, public drug use, and urban squatting. States and localities have authority to establish their own policies in these areas, and the local laws and policies that the Jurisdiction-Based Criteria look to do not violate federal law. The Jurisdiction-Based Criteria therefore straightforwardly conflict with § 12711 and must accordingly be set aside.

### b. The New Criteria exceed Defendants' statutory authority

In addition, all the New Criteria exceed Defendants' statutory authority. For agencies charged with administering statutes, "[b]oth their power to act and how they are to act is authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). An agency "literally has no power to act ... unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). "Any action that an agency takes outside the bounds of its statutory authority … violates the Administrative Procedure Act." *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020).

No statute authorizes Defendants to withhold CoC Builds funding from projects in states and localities that do not implement the Administration's policy agenda or to deny funding to applicants based on activities they engage in or viewpoints they express outside the scope of the funded program. While the law appropriating funding for these grants provides that the funds should be awarded "based on need and other factors to be determined by the Secretary," that cannot be read as giving the Secretary unbounded discretion to award funds based on any factors the Secretary chooses, even if unrelated to orderly grants administration or the statutory purpose. *See* Consolidated Appropriations Act of 2023, 136 Stat. at 5160. Indeed, such a reading would

raise serious constitutional questions under the nondelegation doctrine and must be avoided for that reason alone. *See Mistretta v. United States*, 488 U.S. 361, 373 n.7 (1989) (explaining that a statute violates the nondelegation doctrine if it "fail[s] to articulate any policy or standard that would serve to confine the discretion of the authorities to whom Congress had delegated power").

Even apart from the constitutional problem, the statute on its own does not support that broad reading. It is well established that words cannot be read "in a vacuum" and that, to determine "the scope of delegated authority," courts must look "to the text in context and in light of the statutory purpose." *Gundy v. United States*, 588 U.S. 128, 141 (2019) (cleaned up). Context cabins HUD's authority. The appropriations law provides funding for awards "under the Continuum of Care program." Consolidated Appropriations Act of 2023, 136 Stat. at 5160. And a detailed statutory scheme governs HUD's administration of that program—including by specifying "required" selection criteria and conditions grantees must accept. 42 U.S.C. §§ 11381-11389. For instance, HUD must look at the applicant's track record in reducing the length of homelessness and helping homeless individuals get jobs and "other accomplishments … related to reducing homelessness." *Id.* § 11386a(b)(1)(A). And applicants must agree, for example, to involve individuals experiencing homelessness in project operations where practicable and to certify that children in family programs are enrolled in school. *Id.* § 11386(b).

The grant of authority to the Secretary to adopt additional criteria cannot be read to authorize criteria that are not "of the same kind" as these. *See Martin Luther King, Jr. Cnty. v. Turner*, 785 F. Supp. 3d 863, 886 (W.D. Wash. 2025), *appeal docketed*, No. 25-3664 (interpreting similar grant of authority in CoC statute). And "[s]ubstantive conditions implicating controversial policy matters that are unrelated to the authorizing statute"—like adopting certain

views about gender and facilitating immigration enforcement—"are simply not 'of the same kind' as" those in the statute. *Id.* Even conditions with some tie to homelessness are not authorized, because they find no footing in Congress's policy goals in enacting the statute—none of which involve blackballing jurisdictions based on their local homelessness policies or treating unhoused individuals as criminals.

### c. The New Criteria are arbitrary and capricious

The New Criteria are also arbitrary and capricious. Under arbitrary and capricious review, courts must hold unlawful any agency action that is "not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). To pass muster, an agency must offer "'a satisfactory explanation for its action'" and can neither "rel[y] on factors which Congress has not intended it to consider" nor ignore "an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). While agencies are free to change their existing policies, they must "display awareness that" they are doing so, provide "good reasons for the new policy," and demonstrate that they have taken account of "reliance interests" engendered by the prior policy. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). In assessing the reasonableness of an agency's explanation for its action, "the Court must look to 'the grounds that the agency invoked when it took the action.'" *New York v. Kennedy*, 789 F. Supp. 3d 174, 205 (D.R.I. 2025) (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)). The New Criteria fail on multiple fronts.

Defendants' imposition of the New Criteria fails the most basic requirement of agency decision-making: the Criteria "have not been explained at all," as another district court considering conditions that HUD imposed on other CoC grants recently held. *King Cnty.*, 785 F. Supp. 3d at 888. Defendants provided no explanation for their actions, much less "a satisfactory

explanation for [their] action, including a rational connection between the facts found and the choice made." *Ohio*, 603 U.S. at 292 (cleaned up).

The closest the administrative record comes to supplying reasons for the New Criteria is the statement that the new NOFO "upholds the President's Executive Orders on homelessness and the grantmaking process." AR89. But compliance with an executive order does not satisfy the APA's requirement for reasoned decisionmaking. Indeed, courts have made clear that "an agency cannot avert the 'arbitrary and capricious' analysis by simply deferring to the relevant EO." *Woonasquatucket River Watershed Council v. USDA*, 778 F. Supp. 3d 440, 471 (D.R.I. 2025), *appeal docketed*, No. 25-1428; *see also, e.g.*, *R.I. Latino Arts v. Nat'l Endowment for the Arts*, No. 1:25-cv-00079, 2025 WL 2689296, at *14 (D.R.I. Sept. 19, 2025) (holding that action was arbitrary and capricious where agency's "only explanation" was that it was "furthering the current administration's priorities as provided in" an executive order); *R.I. Coal. Against Domestic Violence v. Bondi*, No. 1:25-cv-00279, 2025 WL 2271867, at *8 (D.R.I. Aug. 8, 2025) (holding that agency cannot "avert the 'arbitrary and capricious' analysis by simply deferring to the relevant Executive Order" (cleaned up)); *Nat'l Council of Nonprofits v. OMB*, 763 F. Supp. 3d 36, 55 (D.D.C. 2025) ("[F]urthering the President's wishes cannot be a blank check for OMB to do as it pleases."); *King Cnty.*, 785 F. Supp. 3d at 888-89 ("[R]ote incorporation of executive orders—especially ones involving politically charged policy matters that are the subject of intense disagreement and bear no substantive relation to the agency's underlying action—does not constitute 'reasoned decisionmaking.'"); *Louisiana v. Biden*, 622 F. Supp. 3d 267, 294-95 (E.D. La. 2022) ("A command in an Executive Order does not exempt an agency from the APA's reasoned decision-making requirement."). A HUD memo also states that the relevant executive orders "take positive steps to promote recovery and self-sufficiency for vulnerable

Americans." AR89. But it does not explain how any of the New Criteria would help achieve that goal or otherwise articulate a "rational connection between the facts found and the choice made," *Ohio*, 603 U.S. at 292.

Defendants also failed to "display awareness" that the New Criteria are a change in policy and to "show that there are good reasons for the new policy." *Fox Television Stations*, 556 U.S. at 515.

Defendants also failed to consider a host of important aspects of the problem. There is no indication that Defendants considered best practices in homelessness policy or any evidence of what strategies are successful. *See, e.g.*, Oliva Decl. ¶ 20 (stating "that the NOFO criteria disadvantages organizations that have the most experience to take on this type of project"). Nor does the agency appear to have considered the detrimental impact of the New Criteria on the communities served by grantees, any alternative more limited policy change, or grantees' reasonable reliance on the opportunity to compete for the funds or the reliance interests of communities served by grantees. *See, e.g.*, Shea Decl. ¶¶ 8-11 (describing extensive reliance interests); *see also* ¶ 27 (describing harm to communities served by grantees). It likewise does not appear to have considered the impact of imposing new conditions that are so vaguely worded that they do not give grantees adequate notice of how to determine whether they meet them (how, for example is an applicant to know whether its local jurisdiction enforces a ban on urban camping or "loitering" at a level HUD will deem sufficient?)—or the possibility that the resulting confusion would deter grantees from applying for fear of making a false statement. *See, e.g.*, Oliva Decl. ¶¶ 19-20; Shea Decl. ¶¶ 20, 21.

Defendants also failed to recognize that the Sex Binary Criterion conflicts with binding statutory and regulatory requirements protecting transgender individuals from discrimination.

*See infra* Section I.A.2.e. Nor did Defendants attempt to reconcile those conflicts—and instead left it unclear how a grantee could comply with those nondiscrimination mandates while at the same time denying transgender people's identity as the Sex Binary Criterion requires.

### d. The New Criteria are contrary to the Constitution

The New Criteria also must be set aside because they are "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B). For the reasons explained in Sections I.B below, the New Criteria violate various separation-of-powers provisions, the Spending Clause, the Tenth Amendment, and the First Amendment.[3] That warrants relief under the APA.

### e. The Sex Binary Criterion is contrary to law

The Sex Binary Criterion must be set aside as contrary to law because it conflicts with binding statutory and regulatory requirements—whether it is understood to restrict applicants' conduct overall, or only their "use of federal funds," TRO Hrg. Tr. at 17. In particular, the Fair Housing Act and Title VII prohibit discrimination in housing and employment, respectively, on the basis of sex, including gender identity. 42 U.S.C. §§ 3604(a)-(b), 2000e–2(a)(1); *see also Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020) (interpreting Title VII to prohibit discrimination based on gender identity); *see also Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519 (2015) (likening Fair Housing Act's sex discrimination provisions to those of Title VII). And binding HUD regulations require that, in CoC programs, individuals be treated in accordance with their gender identity. 24 C.F.R. § 5.106.

Yet the Sex Binary Criterion would require people to commit to treating sex as "binary" and to rejecting "the notion that sex is a chosen or mutable characteristic"—which would

---

[3] The analysis is the same "whether the plaintiff sues directly under the Constitution or under the APA." *Asante v. Azar*, 656 F. Supp. 3d 185, 195 (D.D.C. 2023), *aff'd sub nom. Asante v. Kennedy*, 133 F.4th 97 (D.C. Cir. 2025) (cleaned up).

apparently preclude them from acknowledging transgender individuals' gender identity or treating them in accordance with that identity. Thus, complying with the Sex Binary Criterion would require organizations to violate the Fair Housing Act, Title VII, and/or HUD's nondiscrimination regulations.

### 3. *The September 5 NOFO's truncated application period violates the APA*

The September 5 NOFO's one-week application deadline must be set aside under the APA because it is contrary to law and not in accordance with required procedure. The HUD Reform Act requires HUD to publish the criteria for selecting awardees at least 30 days before the deadline to apply. 42 U.S.C. § 3545(a)(3). Government-wide regulations require the same.[4] 2 C.F.R. § 200.204 (establishing government-wide uniform requirements for federal awards); 24 C.F.R. §§ 84.1, 85.1 (adopting those uniform requirements for HUD). Defendants published the criteria only 7 days before the deadline.

While the statute permits the HUD Secretary to waive this requirement if he determines it "is required for appropriate response to an emergency," *id.* § 3545(a)(5),[5] no emergency existed here. In the required Federal Register notice explaining the basis for waiving the 30-day minimum, HUD asserted that an emergency existed because it was "required by statute to obligate the CoC funds before they expire on September 30, 2025" and needed "adequate time to complete" all the steps for making awards. 90 Fed. Reg. at 47810. But that is an "emergency" entirely of HUD's own making. HUD had already—twice—issued NOFOs for these funds,

---

[4] It is well established "that agencies must comply with their own regulations." *Manguriu v. Lynch*, 794 F.3d 119, 122 (1st Cir. 2015). Agency action that violates a regulation is "contrary to law" in violation of the APA. *Colorado v. Dep't of Health & Human Servs.*, 783 F. Supp. 3d 641, 648 (D.R.I. 2025).

[5] The regulation similarly permits deviation from the 30-day minimum only if the "agency determines that exigent circumstances justify this." 2 C.F.R. § 200.204(b).

including when the current Administration issued a NOFO that "aligned with … the goals of the Administration" in May, accepted and reviewed applications, and selected and preliminarily announced awardees in August. AR232-33, 487, 585. Such a self-inflicted emergency cannot justify circumventing the statutorily mandated notice period or else the agency could readily evade that obligation. *Cf. Make the Rd. N.Y. v. Pompeo*, 475 F. Supp. 3d 232, 262, 263 (S.D.N.Y. 2020) (holding that agency could not point to "a self-inflicted, artificial emergency" to evade required rulemaking procedures because that would mean agencies "could simply wait until the eve of a … deadline" and then claim that exigent circumstances justified not following procedures).

HUD's Federal Register notice suggests that it started over again because it "needed" to "ensure that HUD's … grantmaking activity aligned" with Administration policies, including those announced in the Homelessness E.O. and the Grants E.O. in late July and early August. 90 Fed. Reg. at 47810. But "furthering the President's wishes cannot be a blank check for [an agency] to do as it pleases." *Nat'l Council of Nonprofits v. OMB*, 763 F. Supp. 3d 36, 55 (D.D.C. 2025); *cf. also, e.g.*, *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440, 471 (D.R.I. 2025), *appeal docketed*, No. 25-1428 (holding that "an agency cannot avert" other APA requirements "by simply deferring to the relevant EO."). The statute required HUD to provide applicants at least 30 days, and "[a]n Executive Order cannot supersede a statute." *Am. Fed. of Gov't Employees, AFL-CIO v. Freeman*, 498 F. Supp. 651, 658 n.14 (D.D.C. 1980).

### B. The New Criteria violate the Constitution

The New Criteria also violate multiple constitutional provisions. As noted in Section I.A.2.d above, the Court therefore must set them aside under the APA. But even if APA review were somehow unavailable, Plaintiffs would still be able to bring claims "directly under the

Constitution" for Defendants' constitutional violations. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010). Here, in adopting the New Criteria, Defendants have violated the separation of powers, the Spending Clause, the Tenth Amendment, and (for the Sex Binary Criterion) the First Amendment, and this Court should enjoin Defendants from imposing the New Criteria for each of those reasons. *See Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001) ("[I]njunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally.").

### 1. *The New Criteria violate the separation of powers*

To start, the New Criteria violate multiple constitutional provisions safeguarding the separation of powers. As court after court has recognized, imposing "extra-statutory conditions on federal grant awards as a tool to obtain compliance with [the executive's] policy objectives strikes at the heart of … the separation of powers." *City of Chicago v. Barr*, 961 F.3d 882, 892 (7th Cir. 2020) (holding that the executive branch violated separation of powers by conditioning federal funding on recipients' facilitating immigration enforcement).[6] Defendants have done precisely that here. As explained above, *supra* section I.A.2.a-b, Congress has not authorized Defendants to impose any of the New Criteria and in fact has expressly forbidden HUD from imposing criteria based on local jurisdictions' public policies like the Jurisdiction-Based Criteria here. In doing so anyway, Defendants have exceeded their constitutional authority and

---

[6] *See also, e.g.*, *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1231, 1234-35 (9th Cir. 2018) ("withhold[ing] all federal grants from so-called 'sanctuary' cities and counties" violated separation of powers); *King Cnty.*, 785 F. Supp. 3d 863, 874-75, 885-88 (agencies violated separation of powers by barring grant recipients from "us[ing] grant funds to promote 'gender ideology'" and by requiring recipients to cooperate with federal immigration enforcement); *PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405, 432-41 (D. Md. 2025) (conditioning funding on recipients' denying gender-affirming care violated separation of powers); *Washington v. Trump*, 768 F. Supp. 3d 1239, 1261-63 (W.D. Wash. 2025) ("gender ideology" funding conditions violated separation of powers).

encroached on Congress's power to control federal spending, in violation of foundational separation-of-powers principles.

The Constitution "exclusively grants the power of the purse to Congress, not the President." *Colorado v. U.S. Dep't of Health & Human Servs.*, 788 F. Supp. 3d 277, 308 (D.R.I. 2025) (quoting *City & Cnty. of S.F.*, 897 F.3d at 1231); *see also* U.S. Const., art. I, § 8, cl. 1 (Spending Clause); *id.,* art. I, § 9, cl. 7 (Appropriations Clause). Among the "legislative powers" the Constitution vests in Congress, *see* U.S. Const., art. I, § 1, is the authority to distribute funds to states and private entities to promote "the general welfare" under the Spending Clause, *id.*, art. I, § 8, cl. 1. Exercising these powers, Congress may, within limits, "attach conditions on the receipt of federal funds." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987).

The executive branch may not. Rather, "[w]hen it comes to spending, the President has none of his own constitutional powers to rely upon" and can only exercise authority Congress has delegated. *City & Cnty. of S.F.*, 897 F.3d at 1233-34. Here, because Congress has not delegated to the executive branch the authority to impose the New Criteria, *see supra* section I.A.2.a-b, Defendants unconstitutionally "claim[] for [themselves] Congress's exclusive spending power" and "attempt[] to coopt Congress's power to legislate." *See id.* at 1234.

Defendants also violate the Presentment Clause, "which requires that all federal laws … be passed by both houses of Congress and signed by the President." *O'Connell v. Shalala*, 79 F.3d 170, 173 n.2 (1st Cir. 1996); *see also* U.S. Const., art. I, § 7, cl. 2. Nothing in the Constitution "authorizes the President to enact, to amend, or to repeal statutes" on his own. *Clinton v. City of N.Y.*, 524 U.S. 417, 438 (1998). Defendants' imposition of the New Criteria attempts to amend unilaterally the statutes governing the CoC Builds grant program in violation of the Presentment Clause. *See PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405, 441 (D. Md. 2025)

("Article I does not allow the President to circumvent bicameralism and presentment by unilaterally amending … federal appropriations through an executive order.").

Defendants' imposition of the New Criteria also violates the Take Care Clause, under which the President is obliged to "take care that the laws be faithfully executed," U.S. Const., art. II, § 3. Under the Homeless Assistance Act and the law appropriating funding for CoC Builds specifically, Defendants must disburse funds Congress appropriated to carry out the purposes Congress identified, without regard to criteria Congress has banned. By failing to follow those commands, Defendants fail to faithfully execute the law.

At bottom, the Founders established our system of separated powers to guard against "a concentration of power [that] would allow tyranny to flourish." *City of Chicago*, 961 F.3d at 892. In that system, "the power to wield the purse to alter behavior rests squarely with the legislative branch"—whose "elected representatives and dual chambers [] provide[] institutional protection from the abuse of such power." *Id.* That "institutional protection from abuse" would disappear if the executive branch could "impose [its] policy preferences regardless of the will of Congress." *Id.* Defendants' attempt to leverage CoC Builds funding "to effectuate [the executive's] own policy goals" violates the separation of powers. *See City & Cnty. of S.F.*, 897 F.3d at 1235.

### 2. The New Criteria violate the Spending Clause

The New Criteria also violate the Spending Clause. The Spending Clause empowers Congress to impose and collect taxes and other funds and "provide for the … general Welfare of the United States." Art. I, § 8, cl.1. As part of this power, Congress may "condition[] receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives," but there are limits. *Dole*, 483 U.S. at 206. Those limits include that conditions on receipt of funds must be "unambiguous[]." *Id.* (cleaned up). Requirements imposed under the spending power are "much in the nature of a contract" in that the recipient agrees to comply with

the specified conditions "in return for federal funds." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Conditions must be "unambiguous[] so that recipients can "exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* In addition, the conditions must be "[]related to the federal interest in particular national projects or programs" such that they are "reasonably calculated" to advance "a purpose for which funds are expended." *Dole*, 483 U.S. at 207, 209; *see also Illinois v. FEMA*, No. 25-cv-206, 2025 WL 2716277, at *13 (D.R.I. Sept. 24, 2025). Moreover, the "financial inducement" cannot be "so coercive as to pass the point at which pressure turns into compulsion." *Dole*, 483 U.S. at 211 (cleaned up).

The New Criteria transgress each of these limits. First, the New Criteria are far from unambiguous and otherwise do not allow recipients to "exercise their choice knowingly," *Pennhurst*, 451 U.S. at 17. It is not clear, for example, what it means for a jurisdiction to "cooperate[] with federal immigration enforcement" or to "enforce" prohibitions on public camping, public illicit drug use, or the like. Nearly every jurisdiction cooperates with immigration enforcement and enforces such prohibitions to some degree, but the relevant criteria leave unsaid how much cooperation and enforcement is required. In addition, the Jurisdiction-Based Criteria do not allow applicants to exercise any choice at all, let alone knowingly, because those criteria disqualify applicants based on circumstances wholly outside of their control— namely, whether the jurisdiction in which they operate cooperates with immigration enforcement or has and enforces the Administration's various preferred local policies. And while states and localities could in some cases choose whether to accede to the Administration's wishes in order to make their residents eligible for funding, the Criteria's ambiguity impermissibly prevents them from making that choice "knowingly."

Second, at least some of the Criteria are "unrelated to the federal interest in particular national projects or programs," *Dole*, 483 U.S. at 207. For example, an applicant's views on gender, its activities to reduce the harm from drug use, and a jurisdiction's cooperation with immigration enforcement do not have even a loose tie to the goal of creating new permanent supportive housing to combat homelessness. *See, e.g., California v. U.S. DOT*, No. 25-cv-208, 2025 WL 3072541, at *11 (D.R.I. Nov. 4, 2025) (concluding that condition on transportation grants requiring grantees to cooperate with federal immigration enforcement "blatantly violates the Spending Clause" because it "bears no reasonable relationship to the transportation infrastructure programs to which it has been attached"); *Illinois v. FEMA*, 2025 WL 2716277, at *14 (holding that similar immigration-enforcement condition violated Spending Clause because they were not "reasonably related to the purposes of" disaster relief and emergency preparedness grants).

Finally, the Jurisdiction-Based Criteria exceed Spending Clause limits because they are unduly coercive, as explained further in Section I.B.3 below. *See Dole*, 483 U.S. at 211.

### 3. *The Jurisdiction-Based Criteria violate the Tenth Amendment*

The Jurisdiction-Based Criteria also violate the Tenth Amendment by effectively coercing states to adopt the Administration's preferred policies on immigration, homelessness, and more. The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend X. This means that Congress "lacks the power directly to compel the States to require or prohibit" acts, even if Congress could "pass laws requiring or prohibiting" those acts itself. *New York v. United States*, 505 U.S. 144, 166 (1992). The federal government can "encourage a State to regulate in a particular way" by conditioning the grant of funding based on the states' "taking certain actions that Congress could not require them to

take." *Nat'l Fed'n of Indep. Business v. Sebelius*, 567 U.S. 519, 576 (2012) (emphasis added). But when that encouragement "turns into compulsion," the federal action "runs contrary to our system of federalism." *Id.* at 577-78. The federal government cannot "coerce[] a State to adopt a federal regulatory system as its own." *Id.* at 578.

The Jurisdiction-Based Criteria cross the line from encouragement to coercion, for two reasons. First, the Jurisdiction-Based Criteria do not just affect whether states or localities will get a few million dollars in CoC Builds grants, but rather are part of a government-wide project to withhold critical funding from states and localities that do not adopt the policies at issue. The Homelessness E.O. directs multiple large grant-making agencies—including not only HUD, but also the Departments of Transportation, Health and Human Services, and Justice—to prioritize giving funding to states and municipalities that adopt and enforce the Administration's preferred policies on urban camping, urban squatting, open illicit drug use, involuntary commitment, and sex offender registration. And multiple executive orders direct all federal agencies to cut off all "access to Federal funds" for "so-called 'sanctuary' jurisdictions" that do not adopt the Administration's preferred policies on immigration enforcement. 90 Fed. Reg. at 8446; *see also supra* Background section A.1. Given states' reliance on federal funds,[7] this "threatened loss" of nearly all federal funding "is economic dragooning that leaves the States with no real option but to acquiesce." *NFIB*, 567 U.S. at 582 (holding that "threatened loss of over 10 percent of a State's overall budget" was unconstitutionally coercive).

Second, the Jurisdiction-Based Criteria are unduly coercive because they do not just exclude the jurisdictions themselves from consideration—and allow the jurisdictions to

---

[7] According to a recent analysis, federal funding makes up between 19 percent and 39 percent of states' budgets, depending on the state. Rob Moore, *Which States Rely the Most on Federal Funds,* Scioto Analysis, (Feb. 19, 2025), https://perma.cc/49EP-Q875.

determine whether to take the funds subject to the criteria or leave them—but exclude organizations operating within those jurisdictions from consideration as well. AR2137-38, 2144-45. This blacklisting of organizations based in the targeted jurisdictions is different in kind—and works greater coercion—than merely imposing conditions on the jurisdictions themselves would.

### 4. *The Sex Binary Criterion violates the First Amendment*

The Sex Binary Criterion violates the First Amendment's protection of "the freedom of speech," U.S. Const. amend. I. That Criterion requires applicants—as a condition of eligibility—to commit that they will not "deny the sex binary in humans" or "promote the notion that sex is a chosen or mutable characteristic." AR2145, 2147-48. At the TRO hearing, the government declined to defend the Criterion as written (though HUD has subsequently done nothing to rescind it). TRO Hrg. Tr. at 16-17. Instead, the government explained that it intended for the Criterion to apply only to an applicant's "use of federal funds" and not its other, non-federally funded activities. Either way, the Criterion is unconstitutional.

While the government may, in some circumstances, attach conditions to federal funding that "affect the recipient's exercise of its First Amendment rights," there are limits. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013). The government may not leverage government funding to "aim at the suppression of dangerous ideas." *NEA v. Finley*, 524 U.S. 569, 587 (1998) (cleaned up). Relatedly, imposing a funding condition "not relevant to the objectives of the program" can also violate the First Amendment. *Agency for Int'l Dev.*, 570 U.S. at 214. And, crucially, the government may not restrict "protected [speech] outside the scope of the federally funded program." *Id.* at 217 (citing *Rust v. Sullivan*, 500 U.S. 173, 197 (1991)).

The Sex Binary Criterion transgresses those limits, whether it is understood to limit *any* speech by the applicant or only speech within the scope of the funded program. Indeed, multiple courts have held that similar agency actions barring grantees from using grant funds to "promote

34

gender ideology" likely violate the First Amendment. *See, e.g.*, *R.I. Coal. Against Domestic Violence v. Kennedy*, No. 25-cv-342, 2025 WL 2988705, at *7-8, *12 (D.R.I. Oct. 23, 2025) (holding that provision barring grantees from using grant funds to "promote 'gender ideology'" likely "violate[d] the First Amendment"); *S.F. AIDS Found. v. Trump*, 786 F. Supp. 3d 1184, 1218 (N.D. Cal. 2025) (concluding that restriction on "promot[ing] gender ideology" violated First Amendment even if it "appl[ied] only to activities paid for by the federal government" and not "the recipients' private activity").

To begin, the criterion is "entirely untethered to any 'legitimate objective[s]'" of the programs it burdens. *S.F. AIDS Found. v. Trump*, 786 F. Supp. 3d at 1218. Instead, it is "directed … towards disfavored speech." *Id.* at 1219. That is the case whether the criterion applies only to speech using government funds or more broadly. Either way, a grantee apparently could not "refer to the clients they serve … by any pronoun" or preferred name that matches their gender identity as opposed to their sex assigned at birth. *Id.* But that "is pure speech that has no relation to," *id.*, the grant program's purpose of providing permanent supportive housing to help people overcome homelessness. This impermissible "withholding [of] subsidies for a censorious purpose—aiming to suppress" what the government views as a "dangerous idea[]"—violates the First Amendment. *Id.* at 1220; *see also R.I. Latino Arts v. NEA*, 777 F. Supp. 3d 87, 109-110 (D.R.I. Apr. 3, 2025) (noting that government cannot "use subsidies to suppress 'dangerous ideas'" and concluding that bar on funding art programs that "promote gender ideology" was "a clear First Amendment violation").

In addition, the Criterion impermissibly restricts speech "outside the scope of the federally funded program," *id.* at 217. As written, the Criterion requires applicants to attest that they will not "promote" the government's disfavored view, or "deny" its favored one, period—

whether they are using federal funds or not. The government apparently concedes this is not defensible. *See* TRO Hrg. Tr. at 16-17.

The Criterion would also impermissibly stray beyond the scope of the funded program even if it were interpreted to restrict only the "use of federal funds" to engage in such speech. As the Supreme Court has explained, a funding condition "by its very nature affects 'protected conduct outside the scope of the federal funded program'" when it "demand[s] that a funding recipient[] adopt—as their own—the Government's view on an issue of public concern." *Agency for Int'l Dev.*, 570 U.S. at 218 (quoting *Rust*, 500 U.S. at 197). The Sex Binary Criterion does just that. Under that Criterion, a grantee risks noncompliance if it says anything recognizing someone's gender identity, such as by using a non-binary or transgender person's preferred pronouns. So this Criterion leaves grantees with no choice but to use the pronouns corresponding to the person's sex assigned at birth—speech that reflects the Administration's view that sex is binary and immutable. This Criterion accordingly violates the First Amendment by "requir[ing] 'the affirmation of beliefs that by their nature cannot be confined within the scope of the Government program.'" *R.I. Coal. Against Domestic Violence v. Kennedy*, 2025 WL 2988705, at *8.

## C. The September 5 NOFO's New Criteria and selection process are ultra vires

If review on the other claims were somehow unavailable, the Court should grant summary judgment on Plaintiffs' ultra vires claim.[8] Defendants' imposition of the New Criteria and selection process is ultra vires. This Court has inherent equitable power to enjoin and declare

---

[8] The APA provides an adequate opportunity for judicial review here. *See* supra Section I.A. But if it somehow did not, ultra vires review would be available. See *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (quoting *Bd. of Governors of the Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991)) (holding that ultra vires review is available only if no "statutory review scheme provides aggrieved persons 'with a meaningful and adequate opportunity for judicial review.'").

unlawful executive ultra vires conduct. *R.I. Dep't of Env't Mgmt. v. United States*, 304 F.3d 31, 42 (1st Cir. 2002). An agency acts ultra vires when it "plainly acts in excess of its delegated powers." *Fresno Cmty. Hosp. & Med. Ctr. v. Cochran*, 987 F.3d 158, 162 (D.C. Cir. 2021) (cleaned up); *see California v. Trump*, No. 25-cv-10810-DJC, 2025 WL 2663106, at *7 (D. Mass. Sept. 17, 2025). "To act ultra vires a government official is either acting in a way that is impermissible under the Constitution or acting outside of the confines of his statutory authority." *California*, 2025 WL 2663106, at *7 (quotation omitted). As explained above, *supra* section I.A.2.a, b, d, e; I.A.3, Defendants acted without statutory authority in imposing the New Criteria and one-week application period. Because no statute, constitutional provision, or other source of law authorizes Defendants to take those actions, they are ultra vires, and Defendants must be enjoined from implementing or enforcing them.

## II. Defendants have unlawfully withheld or unreasonably delayed agency action by failing to award CoC Builds funds by the statutory deadline

Finally, Plaintiffs are entitled to summary judgment on their claim that Defendants unlawfully withheld or unreasonably delayed agency action by failing to award CoC Builds funding before the appropriation was set to expire. A court must "compel agency action unlawfully withheld or unreasonably delayed" where an agency was "required to take" a "discrete agency action" but has not. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphasis omitted). Where "Congress imposed a date-certain deadline" that the agency missed, an agency has "unlawfully withheld" agency action. *See Ahadian v. Rubio*, No. 24-cv-12168, 2025 WL 1617224, at *4 n.4 (D. Mass. June 6, 2025) (quoting *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1190 (10th Cir. 1999)). And it may have "unreasonably delayed" agency action even if it did not miss a "concrete deadline." *See id.* (quoting *Forest Guardians*, 174 F.3d at 1190).

Defendants both unlawfully withheld and unreasonably delayed the awarding of CoC Builds grants here.

Defendants unlawfully withheld the awarding of $75 million in CoC Builds grant funding because they failed to take that discrete agency action, and the relevant appropriations act required them to do so by September 30, 2025. In particular, the Consolidated Appropriations Act of 2023 appropriated $75 million specifically for "one-time awards under the Continuum of Care program" for new permanent supportive housing and provided that "these amounts shall be awarded" competitively based on certain factors. Consolidated Appropriations Act of 2023, Pub. L. No. 117-328, div. L, tit. II, 136 Stat. 4459, 5160 (2002). The appropriations act further provided that these amounts would "remain available until September 30, 2025," thereby setting a deadline for making the awards. *Id.* These provisions impose "a nondiscretionary duty to comply … by obligating the relevant funds" by that deadline. *See AIDS Vaccine Advocacy Coal. v. U.S. Dep't of State*, No. 25-cv-00400, 2025 WL 2537200, *13 (D.D.C. Sept. 3, 2025), *appeal docketed*, No. 25-5319, *partially stayed on other grounds*, No. 25A269, 2025 WL 2740571 (U.S. Sept. 26, 2025). Defendants failed to satisfy that duty.

Defendants also "unreasonably delayed" the awarding of the $75 million in CoC Builds grants by waiting until the last minute to start a new process for making the awards. *Cf. AIDS Vaccine*, 2025 WL 2537200, at *13 (concluding that agency "unreasonably delayed" spending funds here "the date by which the funds must be obligated is less than a month away"). In assessing agency delay, courts in the First Circuit have considered six factors that the D.C. Circuit set out in *Telecommunications Research and Action Center v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984) ("TRAC"); *see, e.g.*, *Am. Academy of Pediatrics v. FDA*, 330 F. Supp. 3d 657, 664-67 (D. Mass. 2018). The *TRAC* factors provide six guiding principles. First, "the time

agencies take to make decisions must be governed by a rule of reason." *TRAC*, 750 F.2d at 80 (quotations omitted). Second, "where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason." *Id.* Third, "delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake." *Id.* Fourth, "the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority." *Id.* Fifth, "the court should also take into account the nature and extent of the interests prejudiced by delay." And, sixth, "the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'" *Id.*

These factors all point to the conclusion that Defendants unreasonably delayed making the required CoC Builds awards by abandoning prior efforts to award the funds and waiting until September 5 to begin a new process to make the awards. As for the first and second factors, "Congress has provided a timetable" indicating that it expected HUD to make the grants by September 30. *Id.* Waiting until 25 days before that deadline to even solicit applications is not consistent with any "rule of reason," *id.*—particularly when Congress generally required a minimum of 30 days for the application period alone, 42 U.S.C. § 3545(a)(3). As for the third and fifth factors, awarding these grants to provide housing and support to people who are unhoused implicates "human health and welfare" and prejudices both the interests of the unhoused people who cannot secure housing and the public's interest in taking action to reduce homelessness. *TRAC*, 750 F.2d at 80. On the fourth factor, Defendants have not suggested that making these awards would displace agency actions "of a higher or competing priority"—nor could they given that, by now, they have blown a mandatory deadline set by Congress. *Id.* And

the sixth factor just confirms that the Court need not find any "impropriety" to conclude that the delay was unreasonable. *Id.* Defendants' delay was.

In failing to award the $75 million by the deadline, and in unreasonably delaying steps necessary to make those awards in time, Defendants failed to take "discrete" steps "required" by law. *Norton*, 542 U.S. at 64. This Court accordingly "shall … compel" Defendants to award those funds pursuant to lawful criteria and process. 5 U.S.C. § 706(1).

## III. The Court should tailor relief to ensure that the funds are awarded consistent with congressional intent

As a remedy for the violations set forth above, the Court should vacate and set aside the New Criteria and one-week application period in the September 5 NOFO and issue a permanent injunction to prevent Defendants from imposing the same or substantially similar criteria in the future. Pursuant to 5 U.S.C. § 706(1), the Court should also compel Defendants to comply with the Consolidated Appropriations Act of 2023 and take all reasonable steps to make $75 million in one-time awards under the CoC program for permanent supportive housing pursuant to lawful criteria and process.

### A. The Court should set aside the September 5 NOFO's New Criteria and one-week application period

The Court should set aside the September 5 NOFO's New Criteria and one-week application period pursuant to 5 U.S.C. § 706(2). The APA directs courts to "set aside agency action" when the court determines the action is unlawful. 5 U.S.C. § 706(2). "[T]he text and history of the APA, [and] the longstanding and settled precedent adhering to that text and history," makes clear that to "set aside" an unlawful agency action means to "vacate" that action. *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 829-30 (2024) (Kavanaugh, J., concurring). APA vacatur is not a party-specific remedy. *Id.* at 831 (Kavanaugh, J., concurring).

APA vacatur is warranted here because the New Criteria and one-week application period violate the APA for the multiple reasons described above. This Court should set aside the New Criteria and one-week application process—such that the New Criteria do not apply and cannot disqualify or disadvantage any applicant and such that no applicant will be required to submit an application within one week.

**B. The Court should permanently enjoin Defendants from imposing the New Criteria or substantially similar criteria on CoC Builds grants**

A permanent injunction barring Defendants from imposing the same or substantially similar criteria in the future is additionally warranted to fully protect Plaintiffs from irreparable injury. Injunctive relief on top of vacatur is warranted where setting aside an agency action alone is not "sufficient to redress [the plaintiffs'] injury." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010). So, for example, an injunction is warranted where the agency could attempt to take similar action again "as an end-run to the Court's relief." *Texas v. Cardona*, 743 F. Supp. 3d 824, 897 (N.D. Tex. 2024). In such circumstances, injunctive relief can appropriately "restrain agency officials from … conduct based on the disputed agency [action]." *Chamber of Com. of U.S. v. CFPB*, 691 F. Supp. 3d 730, 745 (E.D. Tex. 2023), *appeal dismissed*, No. 23-40650, 2025 WL 1304573 (5th Cir. May 1, 2025); *see also Cardona*, 743 F. Supp. 3d at 898 (enjoining defendants from "implementing or enforcing" the guidance documents at issue, as well as any future guidance documents promoting a similar interpretation against plaintiffs). Here, injunctive relief is necessary because merely setting aside the New Criteria and one-week application period would not on its own necessarily prevent Defendants from imposing the same or substantially similar criteria in a new NOFO.

Plaintiffs also satisfy the standard for obtaining a permanent injunction. Permanent injunctive relief is appropriate where: "(1) plaintiffs prevail on the merits; (2) plaintiffs would

suffer irreparable injury in the absence of injunctive relief (i.e., an injury for which there is no adequate remedy at law); (3) the harm to plaintiffs would outweigh the harm the defendant would suffer from the imposition of an injunction; and (4) the public interest would not be adversely affected by an injunction." *Ortiz-Bonilla v. Federacion de Ajedrez de Puerto Rico, Inc.*, 734 F.3d 28, 40 (1st Cir. 2013) (cleaned up).

Plaintiffs prevail on the merits of their challenge to the New Criteria for the reasons explained above. *See supra* Section I. They also will suffer "injury for which there is adequate remedy at law" absent permanent injunctive relief, *Ortiz-Bonilla*, 734 F.3d at 40, because they would lose the "opportunity to compete" for the funds on fair terms, *Boston Chapter, NAACP, Inc. v. Beecher*, 371 F. Supp. 507, 520 (D. Mass. 1974). And the balance of equities and the public interest weigh decisively in Plaintiffs' favor because "the government cannot suffer harm from an injunction that merely ends an unlawful practice." *Massachusetts v. Nat'l Insts. of Health*, 770 F. Supp. 3d 277, 326 (D. Mass. 2025) (cleaned up). A permanent injunction is therefore warranted.

### C. The Court should compel Defendants to award the CoC Builds funding pursuant to lawful criteria and process

Finally, the Court should compel Defendants to comply with Congressional direction to award the $75 million appropriated for CoC Builds Grants pursuant to lawful criteria and process. For the reasons explained above, Defendants have unlawfully withheld or unreasonably delayed the awarding of those funds. *See supra* Section II. In such circumstances, the APA provides that the court "shall [] compel" the agency to take the action at issue. 5 U.S.C. § 706(1).

### CONCLUSION

The Court should grant summary judgment to Plaintiffs.

November 13, 2025                              Respectfully submitted,

*/s/ Kristin Bateman*
Kristin Bateman (D.C. No. 90037068)^
Yenisey Rodriguez (D.C Bar No. 1600574)^
Kristen Miller (D.C. Bar No. 229627)^
Robin F. Thurston (D.C. Bar No. 1531399)^
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
kbateman@democracyforward.org
yenisey.rodriguez@democracyforward.org
consultantkmiller@democracyforward.org
rthurston@democracyforward.org

*/s/ Amy R. Romero*
Amy R. Romero (RI Bar # 8262)
Kevin Love Hubbard (MA Bar #704772)^
DeLuca, Weizenbaum, Barry & Revens, Ltd.
199 North Main Street
Providence, RI 02903
(401) 453-1500
Amy@dwbrlaw.com
Kevin@dwbrlaw.com
Cooperating counsel, Lawyers' Committee for RI

*/s/ Antonia K. Fasanelli*
Antonia K. Fasanelli (DC Bar No. 481856)^
National Homelessness Law Center
1400 16th Street, NW, Suite 425
Washington, DC  20036
(202) 638-2535
afasanelli@homelesslaw.org

*/s/ Lynette Labinger*
Lynette Labinger (RI Bar No. 1645)
128 Dorrance St., Box 710
Providence, RI 02903
(401) 465-9565
ll@labingerlaw.com
Cooperating counsel, ACLU Foundation of RI

*Counsel for Plaintiffs*

^ Admitted *pro hac vice*